525 P.2d 984

**Oren TAYLOR, Plaintiff-Respondent,**

v.

**K. T. V. B., INC., an Idaho corporation, Defendant-Appellant.**

**No. 11345.**

Supreme Court of Idaho.

July 29, 1974.

Rehearing Denied Sept. 6, 1974.

Hawley, Troxell, Ennis & Hawley, John T. Hawley, Boise, for defendant-appellant.

Webb, Johnson, Tway, Redford & Greener, Boise, for plaintiff-respondent.

BAKES, Justice.

Defendant-appellant KTVB operates a television station in Boise, Idaho, with a

broadcast range throughout the Boise Valley area. On the evening of March 11, 1972, in a regular news broadcast, a segment of film was aired showing the arrest of plaintiff-respondent Oren Taylor on the previous evening by a force from the Ada County Sheriff's Office and the Garden City Police Department. At the time that Taylor was arrested and taken from his home he was in the nude. During the telecast of his arrest, Taylor's buttocks and genitals were visible to television viewers for a time period of approximately eight- to nine-tenths of one second. Taylor brought this action for invasion of privacy against KTVB. After a trial, the jury returned a verdict for Taylor in the sum of $15,000 and judgment was entered on the verdict. KTVB appeals from that judgment. We reverse the judgment and remand for a new trial.

The arrest had taken place after nightfall on the day of March 10, 1972. Earlier in the evening, Taylor had threatened his housekeeper's sister with a shotgun and told her to get away from his residence. This threat prompted a complaint to law enforcement authorities. A Garden City policeman was dispatched to Taylor's house. The officer was also threatened with the shotgun, and he called for reinforcements. The call was heard by KTVB employees monitoring the police frequencies, and a cameraman was dispatched to cover the story. When reinforcements arrived to aid in Taylor's arrest, the cameraman was also among those gathering. KTVB's cameraman photographed the scene of the arrest as it happened, not realizing that Taylor was nude until Taylor was brought more clearly into view. The cameraman stopped filming when he saw that the person taken into custody was wearing no clothing. Nevertheless, the portion of the film that showed a brief glimpse of Taylor in the nude was aired the following evening along with the rest of the film depicting the arrest.

Taylor testified that he had been ill on the day of his arrest and had spent much of the day lying down and resting. Since he customarily slept in the nude, he had also been resting in the nude, covering himself with a blanket as he lay on his living room davenport. He had not clothed himself when he threatened his housekeeper's sister or the police officer, and he was still nude when the sheriff ordered him out of the house and placed him under arrest.

The issue in this case is whether or not the television media are entitled, without being liable for invasion of privacy, to telecast the arrest of a person in a manner that publicizes embarrassing private facts about the arrest, the disclosure of which would be found offensive and objectionable by reasonable persons. KTVB contends that there is an absolute privilege to report truthfully all details of an event of current public interest without incurring liability for invasion of privacy. Taylor, on the other hand, argues that by his involvement in an arrest he had not forfeited his right to privacy.

Invasion of privacy was adopted as a tort in the state of Idaho in the case of Peterson v. Idaho First National Bank, 83 Idaho 578, 367 P.2d 284 (1961). In that case, the four categories of invasion of privacy enumerated by Professor Prosser in his article, Privacy, 48 Cal.L.R., were set forth as follows:

" '1. Intrusion upon the plaintiff's seclusion or solitude, or into his private affairs.

" '2. Public disclosure of embarrassing private facts about the plaintiff.

" '3. Publicity which places the plaintiff in a false light in the public eye.

" '4. Appropriation, for the defendant's advantage, of the plaintiff's name and likeness.' " 83 Idaho at 583, 367 P.2d at 287.

The second of these categories, i. e., public disclosure of embarrassing private facts, is the particular form of invasion of privacy involved in this case.

The main thrust of appellant KTVB's assignments of error relates to those instructions to the jury relating to the privilege accorded to the news media in televis-

ing current affairs on its news programs, such as the action of the law enforcement officers in arresting Taylor. KTVB challenges the standards which were applied by the trial court in instructing the jury regarding the justification of telecasting embarrassing private facts about the plaintiff in the course of filming the arrest scene. KTVB particularly objects to the court's instructions numbers 13, 14, 15 and 16. Those instructions generally proceeded upon the legal theory that the public interest in a legitimate news broadcast about public or newsworthy personages or incidents would not justify a lurid or indecent treatment of the facts such as would outrage the community's notion of decency. The court instructed the jury that the truth of the portrayal and the motives of the broadcaster were unimportant and not a matter of defense. KTVB further assigns as error the failure of the trial court to instruct the jury that the defendant would only be liable for invasion of privacy if the event published was not newsworthy, *and* the publication had been made with either actual knowledge that the incident would be highly offensive to a person of ordinary sensibilities, or with reckless disregard of whether it would be offensive to a person of ordinary sensibilities. For reasons hereinafter set forth, we conclude that the standards for liability contained in the trial court's instructions were erroneous, and that the appellant KTVB is entitled to a new trial.

This conclusion is dictated both by our analysis of the common law doctrine of invasion of privacy, and by the protection afforded to the news media by the First Amendment of the United States Constitution as interpreted by the United States Supreme Court.

The authorities writing in the area of invasion of privacy have all assumed and concluded that reports of governmental action in criminal matters are the legitimate province of a free press. Warren & Brandeis, The Right of Privacy, 4 Harvard L. R. 193 (1890); Prosser, Privacy, 48 Cal. L.Rev. 385 (1960), cited with approval in

Peterson v. Idaho First National Bank, *supra.*

Professor Prosser in his fourth edition of the Law of Torts (1971), has restated his earlier views:

"The privilege of giving publicity to news and other matters of public interest, was held to arise out of the desire and the right of the public to know what is going on in the world, and the freedom of the press and other agencies of information to tell it. 'News' includes all events and items of information which are out of the ordinary humdrum routine, and which have 'that definable quality of information which arouses public attention.' To a very great extent the press, with its experience or instinct as to what its readers will want, has succeeded in making its own definition of news, as a glance at any morning newspaper will sufficiently indicate. It includes homicide and other crimes, arrests and police raids, suicides, marriages and divorces, accidents, a death from the use of narcotics, a woman with a rare disease, the birth of a child to a twelve year old girl, the reappearance of one supposed to have been murdered years ago, and undoubtedly many other similar matters of genuine if more or less deplorable popular appeal.

. . . . . .

"Caught up and entangled in this web of news and public interest were a great many people who had not sought publicity, but indeed, as in the case of any accused criminal, had tried assiduously to avoid it. They had nevertheless lost some part of their right of privacy. The misfortunes of the frantic victim of sexual assault, the woman whose husband was murdered before her eyes, or the innocent bystander who was caught in a raid on a cigar store and mistaken by the police for the proprietor, could be broadcast to the world, and they had no remedy. Such individuals became public figures for a season; and 'until they have reverted to the lawful and unexciting life led by the great bulk of the com-

munity, they are subject to the privileges which publishers have to satisfy the curiosity of the public as to their leaders, heroes, villains, and victims.' The privilege extended even to identification and some reasonable depiction of the individual's family, although there must certainly be some limits as to their own private lives into which the publisher could not go." Prosser, Law of Torts, 4th Ed., 1971, at pp. 824–826.

The Restatement of Torts takes the position that persons charged with crimes "are the objects of legitimate public interest during a period of time after their conduct . . . has brought them to the public attention; until they have reverted to the lawful and unexciting life led by the great bulk of the community, they are subject to the privileges which publishers have to satisfy the curiosity of the public as to their leaders, heroes, villains and victims." (Restatement of Torts, § 867, Comment c). The right of the public to receive, and the right of the news media to disseminate information concerning those charged with crimes is unquestioned. As stated by the Supreme Court of California in Briscoe v. Reader's Digest Association, 4 Cal.3d 529, 93 Cal.Rptr. 866, 483 P.2d 34 (1971) :

> "There can be no doubt that reports of current criminal activities are the legitimate province of a free press. The circumstances under which crimes occur, the techniques used by those outside the law, the tragedy that may befall the victims—these are vital bits of information for people coping with the exigencies of modern life. Reports of these events

may also promote the values served by the constitutional guarantee of a public trial. Although a case is not to be 'tried in the papers,' reports regarding a crime or criminal proceedings may encourage unknown witnesses to come forward with useful testimony and friends or relatives to come to the aid of the victim. "It is also generally in the social interest to identify adults currently charged with the commission of a crime. While such an identification may not presume guilt, it may legitimately put others on notice that the named individual is suspected of having committed a crime. Naming the suspect may also persuade eye witnesses and character witnesses to testify. For these reasons, while the suspect or offender obviously does not consent to public exposure, his right to privacy must give way to the overriding social interest." 93 Cal.Rptr. at 871, 483 P.2d at 39.

The present case requires us to weigh the delicate interests involved—the right of the public to be given prompt, accurate, full and detailed information about the conduct of police officers and those they are arresting, and the right of persons to be spared from the disclosure of embarrassing, albeit true, private facts about their lives.

■ We hold that the news media are immune from liability for reporting the details of an arrest without regard to the fact that this may result in the disclosure of embarrassing private facts about the arrestee unless it can be shown that the disclosure was made with "malice,"[1] i. e.,

---

[1]. In a comment regarding the use of the term "malice" by the U.S. Supreme Court in New York Times v. Sullivan, Professor Prosser has commented:

"It is certainly highly unfortunate that the Court chose to cling to the discredited term "malice," which has meant all things to all men, and is here highly misleading. A much better word would have been "scienter," since the state of mind required is obviously the same as in deceit actions for intentional misrepresentation. Where this is proved, there is no doubt that there can still

be liability. It can, of course, be proved by the circumstances, as in the case of any other issue; and a failure to distinguish a mere assertion of opinion from others of fact may be sufficient to show reckless disregard of the truth. But the addition of a personal motive is not enough, nor is the use of extravagant language, nor, as the Supreme Court has explicitly held, mere negligence in making the statement without discovering the truth." Prosser, Law of Torts, 4th Ed., 1971, at 821–822.

for the purpose of embarrassing or humiliating the arrestee, or with reckless disregard as to whether that disclosure will result in such embarrassment or humiliation. New York Times, Inc. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); Briscoe v. Reader's Digest Association, *supra*; Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (decided June 25, 1974).

■ The rule which is announced today follows the First Amendment standard set down by the Supreme Court of the United States in false light defamation cases. *See* Gertz v. Robert Welch, Inc., *supra*. KTVB argues that the privilege of the media in reporting news items should be absolute. However, such a rule is neither constitutionally mandated nor reasonably necessary to preserve First Amendment rights. Merely because one has been involved in an arrest, the news media should not be given the right to exploit the details of such an arrest for the purpose of holding the arrestee up to public ridicule and humiliation. Neither should there be a privilege to make reports using obviously embarrassing private facts about the arrestee when no thought has been given to the consequences of such a detailed description of the arrest. Use of material of a highly offensive nature for the purpose of embarrassment of an arrestee, or with reckless disregard for the embarrassing aspects of it is not necessary to keep the public informed.

■ Appellant KTVB further urges us to rule as a matter of law that the disclosure in this case was not "maliciously" motivated. We have reviewed the record and conclude that there was sufficient testimony from which a jury might have found that the airing of the film clip was "malicious." The trial court did not instruct the jury upon the requirement of the plaintiff to prove that there was a "malicious" disclosure of the embarrassing private details of the arrest, i. e., that in order to recover it must be shown that the details were disclosed with the intent of embarrassing and humiliating the defendant or with reckless disregard that the disclosure would embarrass or humilate him. Accordingly, the judgment is reversed and remanded for further proceedings.

Cost to appellant.

DONALDSON, McQUADE and McFADDEN, JJ., concur.

SHEPARD, Chief Justice (dissenting).

I regret that I must disagree not only with the legal conclusions expressed by the majority opinion but also with what appears to me to be only a brief summary and gloss of the facts.

To put more meat on the bones, I offer the following. The plaintiff in this case insists that he had worked on the day in question and returned home at approximately 4:30 p. m. Thereafter he lay in his chair in a nude condition in the company of another man and "his intended," (a woman with whom the plaintiff lived). The sister of "his intended" in the company of several other people, including a 12 year old girl, arrived at the house. The sister knocked at the door, inquiring about her sister. Plaintiff arose from his chair still in nude condition, obtained his fully loaded shotgun, opened the door disclosing himself to the sister and the other persons, stuck the shotgun in the sister's nose, and told her to "get the hell out of" there. She promptly left and notified the police. Shortly thereafter a police officer arrived, knocked at the door, and was greeted by plaintiff in a similar fashion and in similar dress, or lack thereof. That officer retreated and called for reinforcements.

Thereafter dozens of law enforcement officers from various agencies converged upon the scene. With those officers came a TV news cameraman. After the scene was sufficiently set, the camera began to roll and the action started. The Sheriff of Ada County stood to one side of the door and began "knocking" by beating a hole in the door with a shovel. In a stentorian tone, the Sheriff ordered the plaintiff out of the house. Plaintiff stepped out of the

house, onto the porch, and into the hard light of publicity. We are not told if he was minus his shotgun, but he was certainly minus his clothes. For only a fleeting fraction of one second were the genitals and buttocks of the plaintiff preserved on the film of the camera because immediately thereafter the officers manacled and covered plaintiff with a blanket.

A clip from the film was displayed on the evening news show the following evening, depicting the fearless exploit of the law enforcement officers and for less than one second the arrest of plaintiff in a state of nudity. Plaintiff tells us only that the public advertising and viewing of his nudity embarrassed and humiliated him. The jury viewed the videotape but this court has not, and we are thus unable to determine whether the embarrassment and humiliation which allegedly resulted to the plaintiff came about from what was there for the public to see or the lack thereof.

Following plaintiff's arrest he was charged with a criminal offense, tried and found guilty. Members of the defendant's press corps testified that they believed the incident of plaintiff's arrest to be newsworthy but also believed that the inclusion of that portion displaying and showing plaintiff's actual nudity was in poor taste and should not have been shown. Shortly after the newscast defendant's staff member who actually assembled the film for the newscast and included the brief display of plaintiff's nudity was terminated from employment. That termination resulted from his including the nudity sequence in the newscast. Thus ended, probably for all time, the onset of X-rated television newscasts in the Boise Valley.

The majority tells us that "merely because one has been involved in an arrest, the news media should not be given the right *to exploit* the details of such an arrest for the purpose of holding the arrestee up to public ridicule and humiliation. Neither should there be a privilege to make reports using obviously embarrassing *private facts* about the arrestee when no thought has been given to the consequences of such a detailed description of the arrest."

First, I am unable to ascertain in what way there was any exploitation of the plaintiff herein. The defendant merely filmed what was to be seen and displayed it on its news program. Secondly, I am unable to agree that what had been made available to public view by the plaintiff himself could constitute private facts. I entertain doubts that the decisions of the United States Supreme Court cited by the majority support its opinion. Those cases, in my judgment, stem from factual patterns bearing no similarity to the case at bar.

Under the fact situation presented herein where the plaintiff has voluntarily displayed himself in the nude while in the course of committing criminal offenses and while he was being placed under arrest, I would hold that he has waived any privilege he might have had to the privacy of his privates. In my judgment, any arrest is or can be argued to be embarrassing and humiliating. Even the most veteran felon is undoubtedly embarrassed, if nothing else, at being apprehended.

Criminal behavior and its consequences, while perhaps involving elements of privacy of victims, cannot be said to be beyond the legitimate interest of society in general since the conduct is offensive to and prescribed by society in general. I discern no standard by which our lower courts can be guided in the future when faced with such cases. I will await with much interest the development of future fact patterns in this area of the law and the ability of this court to deal with them.

In my opinion, there was no invasion of privacy here and therefore the cases dealing with the press and privacy invasion are irrelevant. I would reverse the judgment and remand the case for granting of defendant's motion n. o. v. and the entry of judgment for defendant.