Partial Concurrence and Partial Dissent by Judge Bea OPINION McKEOWN, Circuit Judge: Investigative journalism has long been a fixture in the American press, particularly with regard to food safety.[1] In the early 1900s, Upton Sinclair highlighted conditions in the meat-packing industry in The Jungle, a novel based on his time working incognito in a packing plant.[2] This case also originates in the agricultural sector— a secretly-filmed exposé of the operation of an Idaho dairy farm. By all accounts, the video was disturbing: dairy" workers were shown dragging a cow across the ground by a chain attached to her neck; twisting cows’ tails to inflict excruciating pain; and repeatedly beating, kicking, and jumping on cows to force them to move.[3] After the film went live on the Internet, both the court of public opinion and the Idaho legislature responded, with the latter eventually enacting the Interference with Agricultural Production law. Idaho Code § 18-7042. That legislation—targeted at undercover investigation of agricultural operations—broadly criminalizes making misrepresentations to access an agricultural production facility as well as making audio and video recordings of the facility without the owner’s consent. Statutes of this genre—dubbed by some as Ag-Gag laws—have been passed in several western states.[4] This appeal highlights the tension between journalists’ claimed First Amendment right to engage in undercover investigations and the state’s effort to protect privacy and property rights in the agricultural industry. Idaho challenges the district court’s determination that four subsections of the statute—§ 18—7042(l)(a)— (d)—are unconstitutional on First Amendment and Equal Protection grounds. The Animal League Defense Fund and various other animal rights organizations (collectively “ALDF”) urge us to uphold the district court’s injunction against enforcement of the statute, arguing that the law criminalizes whistleblower activity and undercover investigative reporting—a form of speech that has brought about important and widespread change to the food industry, an arena at the forefront of public interest. Our analysis is framed by the Supreme Court’s decision in United States v. Alvarez, which addressed the First Amendment and false speech. 567 U.S. 709, 132 S.Ct. 2537, 183 L.Ed.2d 574 (2012). We conclude that Idaho’s criminalization of misrepresentations to enter a production facility, § 18—7042(l)(a), and ban on audio and video recordings of a production facility’s operations, § 18-7042(l)(d), cover protected speech under the First Amendment and cannot survive constitutional scrutiny. In contrast, in accord with Alvarez, Idaho’s criminalization of misrepresentations to obtain records and secure employment are not protected speech under the First Amendment and do not violate the Equal Protection Clause. § 18-7042(l)(b)-(c). Thus, we affirm in part and reverse in part the district court’s entry of summary judgment in favor of ALDF and vacate in part its permanent injunction against enforcement of the statute. We are sensitive to journalists’ constitutional right to investigate and publish ex-posés on the agricultural industry. Matters related to food safety and animal cruelty are of significant public importance. However, the First Amendment right to gather news within legal bounds does not exempt journalists from laws of general applicability. For this reason, we uphold the provisions that fall within constitutional parameters, but strike down those limitations that impinge on protected speech. Background The Investigation In 2012, an animal rights activist went undercover to get a job at an Idaho dairy farm and then secretly filmed ongoing animal abuse there. Mercy for Animals, an animal rights group, publicly released portions of the video, drawing national attention. The dairy farm owner responded to the video by firing the abusive employees who were caught on camera, instituting operational protocols, and conducting an animal welfare audit at the farm. Local law enforcement authorities launched an investigation that culminated in the conviction of one of the employees for animal cruelty. After the video’s release, the dairy farm owner and his family received multiple threats. Idaho’s Interference with Agricultural Production Statute In February 2014, Idaho enacted a law criminalizing “interference with agricultural production” to protect Idaho farmers. See Idaho Code § 18-7042. Relevant here, a person commits the crime of interference with agricultural production if the person knowingly: (a) Is not employed by an agricultural production facility and enters an agricultural facility by force, threat, misrepresentation or trespass; (b) Obtains records of an agricultural production facility by force, threat, misrepresentation or trespass; (c) Obtains employment with an agricultural facility by force, threat, or misrepresentation with the intent to cause economic or other injury to the facility’s operations, livestock, crops, owners, personnel, equipment, buildings, premises, business interests or customers; [or] (d) Enters an agricultural production facility that is not open to the-public and, without the facility owner’s express consent or pursuant to judicial process or statutory authorization, makes audio or video recordings of the conduct of an agricultural production facility’s operations[.][5] Idaho Code § 18-7042(l)(a)-(d). For purposes of this statute, the term “agricultural production” broadly covers “activities associated with the production of agricultural products for food, fiber, fuel and other lawful uses,” and other activities such as “[preparing land for agricultural production” and “[h]andling or applying pesticides ... .”[6] Id. § 18-7042(2)(a). The term “agricultural production facility” is broad and covers “any structure or land, whether privately or publicly owned, leased or operated, that is being used for agricultural production.” Id. § 18-7042(2)(b). Interference with agricultural production is a misdemeanor punishable by up to one year in prison or a fine not in excess of $5,000, or both. Id. § 18-7042(3). A person convicted of this crime must pay restitution to the victim in an amount of twice the damage resulting from violation of the statute. Id. § 18-7042(4). This damages payment includes a victim’s “economic loss[es].” Id. § 19-5304. The legislative history reveals a complex series of motivations behind the statute. The bill was drafted by the Idaho Dairymen’s Association, a trade organization representing Idaho’s dairy industry. When the Association’s lawyer addressed legislators, he stated that one goal of the bill was “to protect Idaho farmers from wrongful interference.... Idaho farmers live and work spread out across the land where they’re uniquely vulnerable to interference by wrongful conduct.” Another goal was to shield the agricultural industry from undercover investigators who expose the industry to the “court of public opinion,” which destroys farmers’ reputations, results in death threats, and causes loss of customers. At the time of the passage of this legislation, Idaho already had a law relating to interference with agricultural research— which has not been challenged—prohibiting knowingly damaging or obtaining property at an agricultural research facility with intent to hinder agricultural research; obtaining access to an agricultural research facility by misrepresentation with the intent to perform acts that would hinder agricultural research; entering an agricultural research facility with-the intent to damage, alter, duplicate or obtain unauthorized possession of records or property related to the agricultural research; obtaining control over records or property of an agricultural research facility with intent to destroy such property without authorization of the facility; and releasing, stealing, or causing death or injury to an animal at an agricultural research facility. Idaho Code § 18-7040(1). The Idaho Dairymen’s Association used this interference with agricultural research law as the framework for § 18-7041. Legislators discussed the bill as protecting against two types of perceived harm to agricultural producers. First, lawmakers expressed concern about physical and operational damage caused by animal rights activists who gain access to agricultural production facilities. For example,' some legislators discussed concerns about farm security and privacy. Others voiced concerns about the intentional destruction of crops, breeding records, and farm structures. Lawmakers also discussed damage caused by investigative reporting: “One of the things that bothers me a lot about the undercover investigation [at the dairy], and the fact that there’s videos, well, we’re being tried and persecuted and prosecuted in the press.” Other legislators- used similar language demonstrating hostility toward the release of these videos, and one supporter of the legislation dubbed animal rights groups as “terrorists” who “use media and sensationalism to attempt to steal the integrity of the producer and their reputation.” One legislator stated that the dairy industry’s reason behind the legislation was “[t]hey could not allow fellow members of the industry to be persecuted in the court of -public opinion.” Another described these videos as used to “publicly crucify a company” -and “as a blackmail tool.” Finally, one legislator indicated that if the video 'had not been published, she did -not “think this bill would ever have surfaced.” Procedural Background In March 2014, ALDF filed suit against Lawrence G. Wasden as Attorney General of Idaho.[7] The complaint alleges that the purpose and effect of the statute “are to stifle political debate about modern agriculture by (1) criminalizing all employment-based undercover' investigations; and (2) criminalizing investigative journalism, whistleblowing by employees, or other expository efforts that entail images or sounds.” ALDF asserts violations of the First and Fourteenth Amendments. Although ALDF claimed preemption under the False Claims Act, Food Safety Modernization Act, and Clean Water Act, ALDF did not address those issues on appeal. The district court granted ALDF’s motion for summary judgment on its First Amendment and Equal Protection claims. The district court concluded that the prohibitions on misrepresentations in § 18-7042(l)(a)-(c) (the “Misrepresentation Clauses”) criminalize speech protected by the First Amendment because Idaho could not “show the lies it seeks to prohibit cause any legally cognizable harm.” The court explained that the regulation on audio and video recordings under § 18-7042(l)(d) (the “Recordings Clause”) covers speech protected by the First Amendment and discriminates based on content because it criminalizes only “recordings of the conduct of an agricultural production facility’s operations.” Thé district court further reasoned that subsections (c) (misrepresentation to gain employment) and (d) (the Recordings Clause) discriminate on the basis of viewpoint because they “burden speech critical of the animal-agriculture industry.” Applying strict scrutiny to all challenged provisions, the district court resolved that even if the state’s interests in privacy and property were compelling, the restrictions were neither narrowly tailored nor the least restrictive means available to protect those interests. The district court also determined that all four challenged subsections violate the Fourteenth Amendment’s Equal Protection Clause and fail rational basis review. The subsections fail on their, face because they classify between whistleblowers in the agricultural industry and whistleblowers in other .industries. The subsections also fail through their purpose because they were “animated by an improper animus toward animal welfare groups and other undercover investigators in the agricultural industry” and “further[ ] no other legitimate or rational purpose.” The court noted that there was “abundant evidence that the law was enacted with the discriminatory purpose of silencing animal rights activists who conduct undercover investigations in the agricultural industry.” The district court deemed moot ALDF’s remaining claims and permanently enjoined enforcement of the challenged subsections. Idaho appeals the district court’s grant of summary judgment, which we review de novo. Roberts v. Continental Ins. Co., 770 F.2d 853, 855 (9th Cir. 1985). Analysis I. The Misrepresentation Clauses: Idaho Code § 18-7042(l)(a)-(c) Subsections (a), (b) and (c) criminalize misrepresentations used to gain entry to agricultural production facilities, obtain records, and, under certain circumstances, secure employment. Relevant here, a person commits the crime of interference with agricultural production if the person knowingly: , ' . (a) Is not employed by an agricultural production facility and enters an agricultural facility by force, threat, misrepresentation or trespass; . (b) Obtains records of an agricultural production facility by force, threat, misrepresentation or trespass; [or] (c) Obtains employment with an agricultural facility by force, threat, or misrepresentation with the intent to cause economic or other injury to the facility’s operations, livestock, crops, owners, personnel, equipment, buildings, premises, business interests or customers[.] Idaho Code § 18-7042(l)(a)-(c) (emphasis added). Idaho argues that the “misrepresentation” component of these provisions regulates conduct induced by false statements of fact. ALDF counters that the subsections regulate pure speech, effectively prohibiting investigative reporters from accessing agricultural production facilities and therefore blocking reporters’ access to material for journalistic exposés. The First Amendment, applied to states through the Fourteenth Amendment, prohibits laws “abridging, the freedom of speech.” U.S. Const., amend I.. Our first task is to determine whether the misrepresentations prohibited in the Idaho statute constitute speech protected by the First Amendment. See Cornelius v. NAACP Legal Def. Fund & Educ. Fund Inc., 473 U.S. 788, 797, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). If the government’s actions do not implicate speech protected by the First Amendment, we “need go no further.” Id. In Alvarez, the Supreme Court examined the Stolen Valor Act, 18 U.S.C. § 704 (“the Act”), a statute criminalizing false claims that the speaker had received the Congressional Medal of Honor. 567 U.S. 709, 132 S.Ct. 2537, 183 L.Ed.2d 574 (2012). Justice Kennedy’s plurality opinion (joined by the Chief Justice and Justices Ginsburg and Sotomayor), as well as Justice Breyer’s concurring opinion (joined by Justice Kagan), concluded that the Act’s flat prohibition of such lies constituted an impermissible restriction on speech protected by the First Amendment. Id. at 729-30, 132 S.Ct. 2537 (plurality opinion); id. at 739, 132 S.Ct. 2537 (Breyer, J., concurring). In deciding that lying about receiving the Medal of Honor, without more, is protected speech, the plurality and concurrence “rejected] the notion that false speech should be in a general category that .is presumptively unprotected.” Id. at 722, 132 S.Ct. 2537 (plurality opinion); accord id. at 731-32, 132 S.Ct. 2537 (Breyer, J., concurring). However, neither the plurality nor the concurrence in Alvarez held that false statements are ahvays protected under the First Amendment. Instead, as the plurality outlines, false speech may be criminalized if made “for the purpose of material gain” or “material advantage,” or if such speech inflicts a “legally cognizable harm.” Id. at 723, 719, 132 S.Ct. 2537. The concurring justices agreed: statutes that criminalize falsities typically require proof of specific or tangible harm. Id. at 734-36, 132 S.Ct. 2537. We thus focus our attention on misrepresentations of the type singled out by the Court—false statements made for material gain or advantage or that inflict harm. A. Idaho Code § 18-7042(1)(a); Entry by Misrepresentation Subsection (a) criminalizes entry into an agricultural production facility “by force, threat, misrepresentation or trespass.” Notably, ALDF challenges only the “misrepresentation” prong of this subsection.[8] And, as we note below, Idaho can easily address the problematic term by simply excising “misrepresentation” from this subsection. Thus, entry by force, threat or trespass would continue to be a criminal violation. Guided by Alvarez, we conclude that subsection (a)’s misrepresentation provision regulates speech protected by the First Amendment. The targeted speech—a false statement made in order to access an agricultural production facility—cannot on its face be characterized as “made to effect a fraud or secure moneys or other valuable considerations.” Alvarez, 567 U.S. at 723, 132 S.Ct. 2537 (plurality opinion). Nor can the misrepresentation provision be characterized as simply proscribing conduct. Like the statute in Alvarez, subsection (a) “seeks to control and suppress all false statements [related to access] in almost limitless times and settings. And it does so entirely without regard to whether the lie was made for the purpose of material gain.” Id. at 722-23, 132 S-Ct. 2537 (plurality opinion). Unlike lying to obtain records or gain employment—which are associated with a material benefit to the speaker—lying to gain entry merely allows the speaker to cross the threshold of another’s property, including property that is generally open to the public. The hazard of this subsection is that it criminalizes innocent behavior, that the overbreadth of this subsection’s coverage is staggering, and that the purpose of the statute was, in large part, targeted at speech and investigative journalists. Idaho’s argument that “the material gain to the person telling the lie is the entry to the property,” is not supported by any authority and does not establish how entry onto the property and material gain are coextensive. Under the statute, any misrepresentation to gain entry could net a criminal prosecution. Take, for example, a teenager who wants to impress his friends by obtaining a highly sought after reservation at an exclusive pop-up restaurant that is open to the public. If he were to call the restaurant and finagle a reservation in the name of his mother, a well-known journalist, that would be a misrepresentation. If the restaurant offers up a reservation on the basis of the mother’s notoriety, granting a “license” to enter the premises and sit at a table, the teenager would be subject to punishment of up to one year in prison, a fine not to exceed $5,000, or both. The teenager risks this potential despite the fact that he might leave before ordering, be discovered and removed by the manager, or his friends might not be impressed at all. In those instances, he would not receive even the secondary benefits of having gained access. In fact, all our teenager would have to do is enter the restaurant and he could be arrested because he gave a false name to the maitre d’ on the phone. This entry alone does not constitute a material gain, and without more, the lie is pure speech.[9] Or the lunch could go off without a hitch. The restaurant is none the wiser, it gets paid for the meal, and loses nothing, but the teenager could still be subject to prosecution. Once again, the lie is pure speech. The teenager does not necessarily even gain protection from trespass liability. Idaho’s criminal trespass law prohibits “[e]n-tering without permission of the owner or the owner’s agent, upon the real property of another” but limits its application to property posted with “No Trespassing” signs that meet certain parameters. Idaho Code § 18-7008(9), Thus, even if the dissent is correct that the teenager receives a license that would not otherwise have been granted, since in some circumstances the teenager may have entered the restaurant with no permission without trespassing, he gains little to nothing from his misrepresentation.[10] Two earlier cases involving investigative reporters and trespass ■ in the First Amendment context foreshadowed the decision in Alvarez, albeit in slightly different scenarios. The Fourth Circuit in Food Lion, Inc. v. Capital Cities/ABC, Inc., 194 F.3d 505 (1999), and the Seventh Circuit in Desnick v. American Broadcasting Companies, Inc., 44 F.3d 1345 (1995), examined whether plaintiffs in a civil action' could maintain a trespass claim against journalists for misrepresenting their identities. Both courts invalidated the trespass claim predicated on the misrepresentations because “the entry was not invasive in the sense of infringing the kind of interest of the plaintiffs, that the law of trespass protects; it was not an interference with the ownership or possession of land.” Desnick, 44 F.3d at 1353; Food Lion, 194 F.3d at 618 (“[I]f we turned successful resume fraud into trespass, we would not be protecting the interest underlying the tort of trespass—the ownership and peaceable possession of land.”).[11] Put differently, “consent to an entry is often given legal effect’even though thé entrant has intentions that if known to the owner of the property would cause him for ... lawful reasons to revoke his consent” because •that entry does not infringe upon the specific interests trespass seeks to protect.' Desnick, 44 F.3d at 1351. This language is prescient in its tracking of Alvarez’s reasoning: some lies quite simply do not inflict any material or legal harm on the deceived party. See Alvarez, 567 U.S. at 718-19, 132 S.Ct. 2537 (plurality opinion); see also id. at 736, 132 S.Ct. 2537 (Breyer, J., concurring) (statutes properly prohibiting false statements are those with “limitations of context, or requirements of proof of injury” to narrow the prohibition to “a subset of lies where specific harm is more likely to occur” and not “where harm is unlikely or the need for the prohibition is small.”). Re-visiting our teenager, we have already established that he is not guilty of ordinary criminal trespass in the absence of a “No Trespassing” sign. However, as with a journalist or even a curiosity seeker who dissembles to get access to the property, under the challenged Idaho law, the teenager would be subject to criminal prosecution for nothing more than what can only be characterized as a fib. Thus, the misrepresentation provision of subsection (a)' regulates protected speech while “targeting] falsity and nothing more?’ Alvarez, 567 U.S. at 719, 132 S.Ct. 2537 (plurality opinion). Such regulation is subject to the “most exacting scrutiny?’ Id. at 724, 132 S.Ct. 2537 (quoting Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 642, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994)). Idaho’s chosen restriction on speech must be “actually necessary” to achieve a compelling government interest, and there must be a “direct causal link between the restriction imposed and the injury to be pre--vented.” Id. at 725, 132 S.Ct. 2537. Subsection (a) cannot survive this high bar. Even assuming Idaho has a compelling interest in regulating property rights and protecting its farm industry, criminalizing access to property by misrepresentation is not “actually necessary” to protect those rights. If, as Idaho argues, its real concern is trespass, then Idaho already has a prohibition against trespass that does not implicate speech in any way. If instead, as a number of the legislators made clear and the dairy lobby underscored, the statute was intended to quash investigative reporting on agricultural production facilities, then the speech aspect of the statute prohibiting misrepresentations is even more problematic. The focus of the statute to avoid the “court of public opinion” and treatment of investigative videos as “blackmail” cannot be squared with a content-neutral trespass law. It is troubling that criminalization of these misrepresentations opens the door to selective prosecutions—for example, pursuing the case of a journalist who produces a 60 Minutes segment about animal cruelty versus letting the misrepresentation go unchecked in the case of the teenager. As Justice Breyer aptly noted in his concurrence, the pervasiveness of false statements, made for better or for worse motives, made thoughtlessly or deliberately, made with or without accompanying harm, provides a weapon to a government broadly empowered to prosecute falsity without more. And those who are unpopular may fear that the government will use that weapon selectively, say, by prosecuting a [politically unpopular individual who makes false claims], while ignoring members of other political groups who might make similar false claims. Id. at 734,132 S.Ct. 2537. In this case, the targeted group—journalists and investigative reporters—could also face enhanced penalties. Violating Idaho’s criminal trespass statute could result in up to six months in prison, a fine not in excess of $1,000, or both, see Idaho Code § 18-7011(1), whereas the penalty under the agricultural protection provision, § 18-7042, could be up to one year in prison, a fíne not in excess of $5,000, or both. We are also unsettled by the sheer breadth of this subsection given the definitions of “agricultural production facility” and “agricultural production.” Id. § 18-7042(2)(a), (b). Applying these definitions, the subsection reaches misrepresentations not only in the context of a large-scale dairy facility or cattle feedlot, but also grocery stores, garden nurseries, restaurants that have an herb garden or grow their own produce, llama farms that produce wool for weaving, beekeepers, a chicken coop in the backyard, a field producing crops for ethanol,' and hardware stores, to' name a few. See Alvarez, 567 U.S. at 722, 132 S.Ct. 2537 (plurality opinion) (criticizing the Act for having “sweeping, quite unprecedented reach”). The subsection’s reach is particularly worrisome because many of the covered entities are, unlike large-scale dairy facilities, places of business that áre open to the public, Imagine a situation in which an Albertsons grocery store opens early to the first one hundred affinity cardholders to visit the new, spectacular food court. Given the expansive definition of “agricultural production,” the Albertsons store would be covered under the statute as a facility -where, agricultural products are “process[ed] and package[ed] ... into food.” An enterprising person with no Al-bertsons card, but representing , otherwise, or, even someone using a friend’s Albert-sons card, falls prey to the statute simply because he wants to see the food-court extravaganza. Under subsection (a), our protagonist would be guilty of a misdemeanor and could be punished by up to one year in prison, a fine not in excess of $5,000, or both—not to.mention a potential restitution award. Idaho Code § 18-7042(3), (4). The same can be said for a restaurant critic who goes undercover, claiming to be a repeat customer in order to get a prime table from which to review the restaurant’s food, service, and ambiance. In these scenarios, the statute punishes speech where there is no fraud, no gain, and no valuable consideration. The limitation that a misrepresentation must be “knowing[]” does not eliminate the threat posed by- this subsection’s staggering reach. The fact that the subsection regulates speech related to property far beyond a classic agricultural facility would invariably result in the chilling of lawful speech. Indeed, “a speaker might still be worried about being prosecuted for a careless false statement, even if he does not have the intent required to render him liable.” Alvarez, 567 U.S. at 736, 132 S.Ct. 2537 (Breyer, J., concurring) (applying intermediate scrutiny). Nor is this subsection the “least restrictive means among available, effective alternatives.” Ashcroft v. ACLU, 542 U.S. 656, 666, 124 S.Ct. 2783, 159 L.Ed.2d 690 (2004). We see no reason, and Idaho has not offered any, why the state could not narrow the subsection by requiring specific intent or by limiting criminal liability to statements that cause a particular harm. Idaho did exactly that with subsection (c), which covers misrepresentation “with the intent to cause economic or other injury.” It is no surprise that after the Supreme Court’s decision in Alvarez, Congress amended the Stolen Valor Act to criminalize only those “[wjhoever, with intent to obtain money, property, or other tangible benefit, fraudulently hold[ ] oneself out to be a recipient” of a qualifying medal. 18 U.S.C. § 704(b) (2013) (emphasis added). Such a limitation would still effectuate agricultural production facility owners’ property rights while complying with Alvarez’ s relatively straightforward First Amendment requirements. The reach of subsection (a) is so broad that it gives rise to suspicion that it may have been enacted with an impermissible purpose. See Elena Kagan, Private Speech, Public Purpose: The Role of Governmental Motive in First Amendment Doctrine, 63 U. Chi. L. Rev. 413, 455 (1996) (“At a certain point—when the asserted interest is insubstantial or when it does not fit the scope of the challenged regulation—the usual presumption of proper purpose topples; there is reason, then, to think that the law, though content neutral, has been tainted by impermissible purpose.”). Our suspicion is not eased after reading the legislative history. The record reflects that the statute was partly motivated to protect members of the agricultural industry from “persecution] in the court of public opinion,” and journalists who use exposés to “publicly crucify a company.” Although, for Equal Protection Clause purposes, we need not decide whether animus motivated this subsection, we do not ignore that a vocal number of supporters were less concerned with the protection of property than they were about protecting a target group from critical speech, which adds to our skepticism that the provision survives the “exacting scrutiny” required under Alvarez. See FCC v. League of Women Voters of Cal., 468 U.S. 364, 387 n.18, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984) (expressing skepticism about the motivation behind a bill when some supporters were concerned with protecting themselves from critical speech). In the same vein, if intermediate scrutiny is the standard, as Justice Breyer advocates in Alvarez, then this subsection would still fail. Subsection (a) criminalizes speech that inflicts no “specific harm” on property owners, “ranges very broadly,” and risks significantly chilling speech that is not covered under the statute. Alvarez, 567 U.S. at 736-37, 132 S.Ct. 2537 (Breyer J., concurring). Additionally, it is “possible substantially to achieve the Government’s objective in less burdensome ways” with “a more finely tailored statute.” Id. at 737, 132 S.Ct. 2537. Even under intermediate scrutiny, the subsection “works disproportionate constitutional harm.” Id. at 739, 132 S.Ct. 2537. There is, of course, an easy fix to this First Amendment problem: simply strike the word “misrepresentation” from the subsections. Idaho explicitly invites this result in its discussion of the statute’s severability clause, and ALDF’s surgical challenge indirectly endorses this remedy. Under Idaho law, an invalid portion of a statute may be severed where “part of a statute ... is unconstitutional and yet is not an integral or indispensable part of the measure.” Voyles v. City of Nampa, 97 Idaho 597, 548 P.2d 1217, 1220 (1976). Because the proscription on misrepresentations is neither integral nor indispensable to the subsection’s goal of protecting property rights, the offending term “misrepresentation” should be stricken, leaving the remainder of the subsection intact. In light of this resolution, we need not analyze subsection (a) under the Equal Protection Clause. B. Idaho Code § 18-7042(l)(b): Obtaining Records by Misrepresentation Subsection (b)—which criminalizes obtaining records of an agricultural production facility by misrepresentation[12] —protects against a “legally cognizable harm associated with a false statement” and therefore survives constitutional scrutiny under Alvarez. 567 U.S. at 719, 132 S.Ct. 2537. Alvarez highlights that a false statement made in association with a legally cognizable harm or for the purpose of material gain is not protected. Id. at 719, 723, 132 S.Ct. 2537. Unlike false statements made to enter property, false statements made to actually acquire agricultural production facility records inflict a property harm upon the owner, and may also bestow a material gain on the acquirer. This subsection is aimed at conduct— obtaining records—that has long been prohibited in Idaho. For decades, Idaho has lawfully proscribed similar types of conduct that infringe on property rights. For example, Idaho criminalizes conversion, which involves “any distinct act of dominion wrongfully exerted over another’s personal property in' denial or inconsistent with his rights therein.” Wiseman v. Schaffer, 115 Idaho 537, 768 P.2d 800, 803 (1989) (citation omitted); see also Idaho Code §§ 18-2403(3), 18-7001(1). Idaho also criminalizes theft by false pretenses, which involves “a wrongful taking, obtaining or withholding of another’s property” by conduct constituting “obtaining property, money or labor under false pretenses.” Idaho Code § 18-2403(2); State v. Larsen, 76 Idaho 528, 286 P.2d 646, 648 (Idaho 1955) (citation omitted) (“[a] false pretense may consist in any act, word, symbol, or token calculated and intended to deceive”). Larceny, which involves the “fraudulent obtaining of personal property, and carrying that property away with the intent permanently to deprive the owner thereof,” is also prohibited. State v. Jesser, 95 Idaho 43, 501 P.2d 727, 736 & n.29 (1972). Criminalizing the obtaining of records by misrepresentation is one of a variety of Idaho statutes that protect property rights. Obtaining an agricultural production facility’s records by misrepresentation inflicts a “legally cognizable harm” by impairing an agricultural production facility owner’s ability to control who can assert dominion over, and take possession of, his property. Additionally, obtaining records through misrepresentation may also infringe on other rights by, for example, exposing proprietary formulas, trade secrets, or other confidential business information to unwanted parties. See Idaho Code § 48-801 et seq. (prohibiting misappropriation of trade secrets). The legislative history illustrates how such conduct has harmed, and threatens to harm, agricultural production facility owners. For- example, legislators' expressed general concern about damage to breeding papers, and one legislator noted an instance in.which the breeding papers of a mink ranch were “tossed” into a “pile,” “damag[ing] the whole operation.” The agricultural industry also expressed concern about the theft of facility records, particularly when .such theft leads to the release of a facility’s proprietary and confidential information, including divulging locations of genetically engineered crops or valuable research -documents for sale to competitors. -Although some legislators wanted to silence, investigative journalists reporting on the agricultural industry, the full legislative history shows that a legitimate purpose for enacting the subsection was to prevent harm from damaged or stolen records. Obtaining records may also bestow a “material gain” on the speaker. See Alvares, 567 U.S. at 723, 132 S.Ct. 2537 (plurality .opinion). The records may contain confidential information, such as breeding histories of animals and livestock, and other proprietary research and development information valuable to those in the industry. Once disclosed, this information may lose its confidential or proprietary research status. Acquiring records by misrepresentation results in something definitively more than does entry onto land—it wreaks actual and potential harm on a facility and bestows material gain on the fibber. So unlike subsection (a), subsection (b) does not regulate constitutionally protected speech, and does not run afoul of the First Amendment.[13] ' Nor does subsection (b) violate the Equal Protection Clause. The district'court determined that the statute was “animated by an improper animus toward animal welfare groups and other undercover investigators in the agricultural industry” and could not survive rational basis review. We agree that animus was one of the motivating factors but disagree as to the conclusion. Legislation is generally presumed to be valid and will be sustained under the Equal Protection Clause “if the classification drawn by the statute is rationally related to a legitimate state interest.” City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). However, neither “a bare ... desire to harm a politically unpopular group” nor “negative attitude[s]” or “fears” about that group constitute a legitimate government interest for the purpose of this review. Id. at 448,105 S.Ct. 3249. When a law exhibits a desire to .harm an unpopular group, courts will often apply a “more searching” application, of rational basis review. Lawrence v. Texas, 539 U.S. 558, 580, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003) (O’Connor, J., concurring); see also Cleburne, 473 U.S. at 448-50, 105 S.Ct. 3249; U.S. Dep’t of Agric. v. Moreno, 413 U.S. 528, 535-38, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973), When the politically unpopular group is not a traditionally suspect class, a court may strike down the challenged statute under the Equal Protection Clause “if the statute serves- no legitimate governmental purpose and if impermissible animus toward an unpopular group prompted the statute’s enactment.” Mountain Water Co. v. Mont. Dep’t of Pub. Serv. Regulation, 919 F.2d 593, 598 (9th Cir. 1990) (emphasis added); Moreno, 413 U.S. at 534, 93 S.Ct. 2821. We invoke searching scrutiny here; Although animus towards particular speech by reporters and activists was one factor driving Idaho’s decision to pass the statute, to strike down the law, we must also determine whether the law serves “no legitimate governmental purpose.” Mountain Water Co., 919 F.2d at 598. The overall purpose of § 18-7042 is to protect agricultural production facilities from interference by wrongful conduct. As noted, the legislative history relevant to subsection (b) describes situations in which agricultural production facilities have been, or may be, harmed as a result of a misrepresentation leading to the acquisition of records. Idaho’s desire to protect against harm relating to an agricultural' production facility’s most sensitive information—affecting both property rights and privacy interests—is a legitimate government interest. It also bears noting that the penalty provisions for falsely obtaining records under this statute are in line with the penalties in Idaho’s other statutes relating to records and property offenses. See, e.g., Idaho Code §§ 18-2403(2)(d), • 18-2407, 18-2408 (theft by false promise); 18-7001 (malicious injury to property); 48-803 (misappropriation of trade secrets). Subsection (b) does not offend the Equal Protection Clause because it does not rest exclusively on an “irrational prejudice” against journalists and activists. Cleburne, 473 U.S. at 450, 105 S.Ct. 3249. C. Idaho Code § 18-7042(l)(c): Obtaining Employment by Misrepresentation Subsection (c) criminalizes knowingly “[o]btain[ing] employment with an agricultural production facility by ... misrepresentation with the intent to cause economic or other injury” to the facility’s operations, property, or personnel. Almost as though the Idaho legislature drafted this provision with Alvarez by its side, this subsection follows the 'Supreme Court’s guidance as to what constitutes a lie made for material gain. Indeed, thé plurality in Alvarez explicitly stated that “[w]here false claims are made to effect a fraud or secure moneys or other valuable considerations, say offers of employment, it is well established that the Government may restrict speech without affronting the First Amendment.” 567 U.S. at 723, 132 S.Ct. 2537 (emphasis added). The misrepresentations criminalized in subsection (c) fall squarely into this category of speech. Additionally, subsection (c) limits criminal liability to only those who gain employment by misrepresentation and who have the intent to cause economic or other injury to the agricultural production facility, which further cabins the prohibition’s scope. Given this clear limitation, we disagree with ALDF that the statute would reach “a person who overstates her education or experience to get a job for which she otherwise would not have qualified, whether the person is an undercover investigator or not,” because the requisite intent to injure would not be satisfied. On the other hand, this subsection would apply to an employee hired with an intent , to harm the employer, which, as Idaho points out, is a breach of the covenant of good faith and fair dealing that is implied in all employment agreements in Idaho, Jenkins v. Boise Cascade Corp., 141 Idaho 233, 108 P.3d 380, 389-90 (2005); cf. Shackelford v. Shirley, 948 F.2d 935, 938 (5th Cir. 1991) (“[T]hreats made with specific intent to injure and focused on a particular individual easily fall into that category of speech deserving of no first amendment protection.”). Although it may be true that “[t]he goal of undercover, employment-based investí-gations is not to ‘secure moneys or other valuable considerations’ for the investigator, but rather to expose threats to the public,” ALDF ignores that the Supreme Court singled out offers of employment and that these undercover investigators are nonetheless paid by the agricultural production facility as part of their employment. Of course, this does not mean that every investigative reporter hired under false pretenses intends to harm the employer. That is a critical element that requires proof. We are also not persuaded by ALDF’s arguments that the statute was enacted solely to suppress a specific subject matter or viewpoint. See R.A.V. v. City of St. Paul, 505 U.S. 377, 384, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). We reject ALDF’s argument that the statute’s restitution clause is a way to punish journalists and whistle-blowers for printing exposés, because we do not interpret the restitution clause to include reputational and publication damages. See Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 52, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988). The restitution clause requires a court to order a defendant “to make restitution to the victim of the offense ... in an amount equal to twice the value of the damage resulting from the violation” of the statute. Idaho Code §§ 18-7042(4), 19-5304. Restitution is made for the “economic loss” to the victim. Idaho Code § 19-5304(l)(a). This includes “the value of property taken, destroyed, broken, or otherwise harmed, lost wages, and direct out-of-pocket losses or expenses, such as medical expenses resulting from the criminal conduct.” Id. It does not include “less tangible damage such as pain and suffering, wrongful death or emotional distress.” Id. That the statute excludes “less tangible damage” such as emotional distress indicates that reputational damages would not be considered an “economic loss,” and we are not aware of a case suggesting otherwise. Rather, Idaho case law defines “economic loss” as “tangible out-of-pocket loss” which the victim “actually suffers.” State v. Straub, 153 Idaho 882, 292 P.3d 273, 280 (2013). The restitution clause focuses on actual, quantifiable economic loss as opposed to abstract damages such as reputational harm. See id. In the absence of Idaho case law to the contrary, we read the statute’s restitution clause as excluding reputational and publication damages.[14] See Berger v. City of Seattle, 569 F.3d 1029, 1046 (9th Cir. 2009) (en banc) (“[Wlhere an unconstitutionally broad statute is readily subject to a narrowing construction that would eliminate its constitutional deficiencies, we accept that construction.”) (internal quotation marks omitted). The district court erred by granting summary judgment on this ground. For the same reasons as provided in our analysis of subsection (b), subsection (c) does not violate the Equal Protection Clause because it serves a “legitimate governmental purpose.” Mountain Water Co., 919 F.2d at 598. The same property and privacy concerns apply here—employees have access to limited areas of an agricultural production facility and other confidential information that may lead to destruction or serious harm—and Idaho has a legitimate governmental purpose in restricting such employment-seeking misrepresentations. This result follows from Alvarez. By establishing that misrepresentations to “secure ... offers of employment” may be restricted, the Court implicitly recognized that a government interest exists in restricting such speech. Alvarez, 567 U.S. at 723, 132 S.Ct. 2537. Thus, this subsection has a legitimate governmental purpose beyond an “irrational prejudice” against journalists and activists. City of Cleburne, 473 U.S. at 450, 105 S.Ct. 3249. II. The Recordings Clause—Idaho Code § 18—7042(l)(d) We now turn to the Recordings Clause, which prohibits a person from entering a private agricultural production facility and, without express consent from the facility owner, making audio or video recordings of the “conduct of an agricultural production facility’s operations.” Idaho Code § 18—7042(l)(d). The Recordings Clause regulates speech protected by the First Amendment and is a classic example of a content-based restriction that cannot survive strict scrutiny. We easily dispose of Idaho’s claim that the act of creating an audiovisual recording is not speech protected by the First Amendment. This argument is akin to saying that even though a book is protected by the First Amendment, the process of writing the book is not. Audiovisual recordings are protected by the First Amendment as recognized “organ[s] of public opinion” and as a “significant medium for the communication of ideas.” Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 501, 72 S.Ct. 777, 96 L.Ed. 1098 (1952) (extending First Amendment protection to movies). Indeed, “[w]e live, relate, work, and decide in a world where image capture from life is routine, and captured images are part of ongoing discourse, both public and private.” Seth F. Kreimer, Pervasive Image Capture and the First Amendment: Memory, Discourse, and the Right to Record, 159 U. Pa. L. Rev. 335, 337 (Jan. 2011). It is no surprise that we have recognized that there is a “First Amendment right to film matters of public interest.” Fordyce v. City of Seattle, 55 F.3d 436, 439 (9th Cir. 1995). It defies common sense to disaggregate the creation of the video from the video or audio recording itself. The act of recording is itself an inherently expressive activity; decisions about content, composition, lighting, volume, and angles, among others, are expressive in the same way as the written word or a musical score. Rejecting an argument remarkably similar to Idaho’s pitch here, we observed that neither the Supreme Court nor [the Ninth Circuit] has ever drawn a distinction between the process of creating a form of pure speech (such as writing or painting) and the product of these processes (the essay or artwork) in terms of the First Amendment protection afforded.... The process of expression through a medium has never been thought so distinct from the expression itself that we could disaggregate Picasso from his brushes and canvas, or that we could value Beethoven without the benefit of strings and woodwinds. In other words, we have never seriously questioned that the processes of writing words down on paper, painting a picture, and playing an instrument are purely expressive activities entitled to full First Amendment protection. Anderson v. City of Hermosa Beach, 621 F.3d 1051, 1061-62 (9th Cir. 2010) (determining that the tattooing process is purely expressive activity protected by the First Amendment); see also ACLU v. Alvarez, 679 F.3d 583, 595 (7th Cir. 2012) (“The act of making an audio or audiovisual recording is necessarily included within the First Amendment’s guarantee of speech.”); Fields v. City of Philadelphia, 862 F.3d 353, 358 (3d Cir. 2017) (“The First Amendment protects actual photos, videos, and recordings ... and for this protection to have meaning the Amendment must also protect the act of ei'eating that material.”) (emphasis added). Because the recording process is itself expressive and is “inextricably intertwined” with the resulting recording, the creation of audiovisual recordings is speech entitled to First Amendment protection as purely expressive activity. See Anderson, 621 F.3d at 1062. The Recordings Clause prohibits the recording of a defined topic—“the conduct of an agricultural production facility’s operations.” This provision is an “obvious”, example of a content-based regulation of speech because it “defin[es] regulated speech by particular subject matter.” Reed v. Town of Gilbert, — U.S— 135 S.Ct. 2218, 2227, 192 L.Ed.2d 236 (2015); see also United States v. Stevens, 559 U.S. 460, 468, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010) (a statute was content-based when it prohibited “visual [and] auditory depiction[s] ... depending on whether they depict conduct in which a living animal is intentionally harmed” (alterations in original)). A regulation is content-based when it draws a distinction “on its face” regarding the message the speaker conveys or “when the purpose and justification for the law are content based.” Reed, 135 S.Ct. at 2228. The Recordings Clause checks both boxes. It would permit filming a vineyard’s art collection but not the winemaking operation. Likewise, a videographer could record an after-hours birthday party among co-workers, a farmer’s antique car collection, or a historic maple tree but not the animal abuse, feedlot operation, or slaughterhouse conditions. Problematically, Idaho has effectively eliminated the subject matter of any audio and visual recordings of agricultural operations made without consent and has therefore “prohibited] public discussion of an entire topic.” In re Nat'l Sec. Letter, 863 F.3d 1110, 1122 (9th Cir. 2017) (internal-, quotation marks omitted),-.And,-because the Recordings Clause prohibits the filming of agricultural “operations” but nothing else, its application explicitly pivots on the content of the recording; in other words, only by viewing the recording can the Idaho authorities make a determination about criminal liability. See League of Women Voters, 468 U.S. at 383, 104 S.Ct. 3106 (a statute is content-based when “enforcement authorities must necessarily examine the content of the message” to determine whether -it complies with the statute). Here, -the statute depends not just on “where they say” the message but also—critically—-“on what they say.” McCullen v. Coakley, — U.S.—, 134 S.Ct. 2518, 2531, 189 L.Ed.2d 502 (2014). As a content-based regulation, the Recordings Clause is. constitutional only if it withstands strict scrutiny, meaning it “is necessary to serve a compelling state interest” and “is narrowly drawn to achieve that end.” Perry Educ. Ass’n v. Perry Local Educators’Ass’n, 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). Strict scrutiny is “an exacting test” requiring “some pressing public necessity, some essential value that has to be preserved; and even then the law must restrict as little speech as possible to serve the goal.” Turner, 512 U.S. at 680, 114 S.Ct. 2445. As with the Misrepresentation Clauses, Idaho asserts that the Recordings Clause protects both property and privacy interests. Even assuming a compelling government interest, Idaho has not satisfied the narrow tailoring requirement because the statute is both under-inclusive and over-inclusive. Prohibiting only “audio or video recordings,” but saying nothing about photographs, is suspiciously under-inclusive. City of Ladue v. Gilleo, 512 U.S. 43, 51, 114 S.Ct. 2038, 129 L.Ed.2d 36 (“[T]hat a regulation of speech may be impermissibly underinclusive is firmly grounded in basic First Amendment principles.”). Why the making of audio and video recordings of operations would implicate property-or privacy harms, but photographs of the same content would not, is a mystery. This distinction defies the old adage that “a picture is worfh a thousand words.” Nor has Idaho explained how limiting the filming of operations, but nothing else, effectuates its interests better than eliminating all audio and video recordings at agricultural production facilities. Presumably, for example, an unauthorized recording of the agricultural production facility’s buildings would still implicate Idaho’s concerns about property, and the unauthorized filming of an employee birthday party would implicate concerns about privacy, Without some legitimate explanation, we are left to conclude that Idaho is singling out for suppression one mode of speech— audio and video recordings of agricultural operations—to -keep controversy and sus-< pect practices out of the public eye. Reed, 135 S.Ct. at 2229 (content-based laws lend themselves to use for “invidious, thought-control purposes”). The district court aptly noted that “[t]he recording prohibition gives agricultural facility owners veto power, allowing owners to decide what can and cannot be recorded, effectively turning them into state-backed censors able to silence unfavorable speech about their facilities.” The Recordings Clause is also over-inclusive and suppresses more speeeh than necessary to further Idaho’s stated goals of protecting property and privacy. See Lone Star Security and Video, Inc. v. City of Los Angeles, 827 F.3d 1192, 1197 (9th Cir. 2016). Because there are “various other laws at [Idaho’s] disposal that would allow it to achieve its stated interests while burdening little or no speech,” the law is not narrowly tailored. Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 949 (9th Cir. 2011) (en banc) (applying intermediate scrutiny). For example, agricultural production facility owners can vindicate their rights .through tort laws against theft of trade secrets and invasion of- privacy, Idaho Code § 48-801 et seq. (prohibiting misappropriation- of trade secrets); Taylor v. K.T.V.B., Inc., 96 Idaho 202, 525 P.2d 984, 985 (1974) (outlining the invasion of privacy torts). To the extent .the legislators expressed concern that fabricated recordings of animal abuse would invade privacy rights, the victims can turn to defamation actions for recourse. Even still, as Alvarez points out, “[t]he.remedy.for speech that is false is speech that is true”—-and not, as Idaho would like, the suppression of that speech. 567 U.S. at. 727, 132 S.Ct. 2537. For these reasons, the Recordings Clause cannot survive First Amendment scrutiny and is therefore unconstitutional. In light of this result, we need not analyze the Recordings Clause under the Equal Protection Clause. In sum, we affirm the district court’s grant of summary judgment with respect to §§ 18-7042(l)(a) and (d). We reverse the district court’s grant of summary judgment with respect to §§ 18-7042(l)(b) and (c). The permanent injunction should be modified accordingly. AFFIRMED IN PART, REVERSED IN PART. Each party shall bear its own costs on appeal. . See Brooke Kroeger, Undercover Reporting: An American Tradition, IRE J. 20 (Spring 2014). . Upton Sinclair, The Jungle (Dover Thrift eds., Dover Publications 2001) (1906). . Mercy for Animals, Burger King Cruelty— Video Exposes Horrific Animal Abuse at a Burger King Dairy Supplier, YouTube (Oct. 9, 2012), https ;//www.youtube. com/watch? v=1 N_YcWOuVqk& oref=https% 3A% 2F% 2Fwww.youtube.com% 2Fwatch% 3Fv% 3DlN_YcWOuVqk& has_verified= 1. ,See Rita-Marie Cain Reid & Amber L, King-ery, Putting A Gag on Farm Whistleblowers: The Right to Lie and the Right to Remain Silent Confront State Agricultural Protectionism, 11 J. Food L. & Poly 31, 35-36 (Spring 2015) (Montana, Kansas, North Dakota); Lewis Bollard, Ag-Gag: The Unconstitutionality of Laws Restricting Undercover Investigations on Farms, 42 Envtl. L. Rep. News & Analysis 10960, 10963-66 (Oct. 2012) (Iowa, Utah). . The statute also criminalizes physical damage to an agricultural production facility’s operations, Idaho Code § 18—7042(l)(e), but that provision has not been challenged in this case. . In full, the law defines "agricultural production” to mean “activities associated with the production of agricultural products for food, fiber, fuel and other lawful uses,” including but not limited to: "construction, expansion, use, maintenance and repair of an agricultural production facility; preparing land for agricultural production; handling or applying pesticides, herbicides or other chemicals, compounds or substances labeled for insects, pests, crops, weeds, water or soil; planting, irrigating, growing, fertilizing, harvesting or producing agricultural, horticultural, floricultural and viticultural crops, fruits and vegetable products, field grains, seeds, hay, sod and nursery stock, and other plants, plant products, plant byproducts, plant waste and plant compost; breeding, hatching, raising, producing, feeding and keeping livestock, dairy animals, swine, furbearing animals, poultry, eggs, fish and other aquatic species, and other animals, animal products and animal byproducts, animal waste, animal compost, and bees, bee products and bee byproducts; processing and packaging agricultural products, including the processing and packaging of agricultural products into food and other agricultural commodities; [and] manufacturing animal feed,” Idaho Code § 18-7042(2)(a). . ALDF also brought claims against Governor C.L, "Butch” Otter, but the district court dismissed him as a defendant. His dismissal is not challenged on appeal. . The same is true of subsections (b) and (c); ALDF challenges only the misrepresentation prongs. In its opening brief, Idaho limits the definition of a "misrepresentation” to an af- ' firmative misrepresentation—-not an omission: "[t]his means that the representations must be affirmative; omissions are insufficient. And they must be knowingly false. Mistakes or opinions will not support a prosecution." . We disagree with the district court's suggestion that the only harm from gaining access to property by misrepresentation “would arise, say, from the publication of a story about the facility.” Such reasoning is problematic because it assumes, among other things,.that a publication about the facility will necessarily harm the facility. At issue here is the speech to gain entry to the facility, not the journalistic creation or speculative harm that may "arise” after entry. Focusing on such speculative harm sweeps in too many scenarios in which a person entering the property causes no harm to the property or its owner. This approach also places a value judgment on the reporting itself and undermines the First Amendment right to critique and criticize. . The dissent’s citation to Green v. Beaver State Contractors, Inc., 93 Idaho 741, 472 P.2d 307, 307 (1970) is misplaced. This is not the case of the hapless teenager and has nothing to do with the First Amendment and entry upon property. Rather, it is a civil contract matter and the question—left unanswered— was whether there were any civil damages for trespass by a contractor who traversed land without authorization. . ,On another claim, the Fourth Circuit determined that the reporters "committed trespass by breaching their duty of loyalty” as employees of Food Lion. Food Lion, 194 F.3d at 518. Idaho did not raise any similar arguments here and, therefore, this portion of the Fourth Circuit’s holding is inapposite, to our decision. . We read the statute to cover records obtained from the agricultural production facility and not as implicating records obtained via Idaho’s Public Records Act, Idaho Code § 74-101 et seq., or other lawful avenues. . Because we determine that subsections (b) and (c) do not-burden speech protected by the First Amendment, the subsections do not discriminate on the basis of the fundamental right to speech. . On a more basic level, we cannot see how the restitution provision is inevitably viewpoint based. Restitution is pegged to economic loss, not to the view expressed, which could be a positive puff piece or a negative critique. The issue is documented loss, not viewpoint.