RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 25a0201p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

MIKE YODER; DRONE DEER RECOVERY LLC,
identified on initiating documents as Drone Deer
Recovery Media, Inc.; JEREMY FUNKE,

　　　　　　　　*Plaintiffs-Appellants*,

　　*v.*

SCOTT BOWEN, in his official capacity as Director of
the Michigan Department of Natural Resources,
identified on initiating document as Shannon Lott,

　　　　　　　　*Defendant-Appellee*.

┐
│
│
│
│
> No. 24-1593
│
│
│
│
┘

───────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:23-cv-00796—Paul Lewis Maloney, District Judge.

Argued: January 29, 2025

Decided and Filed: July 31, 2025

Before: COLE, WHITE, and MATHIS, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Andrew R. Quinio, PACIFIC LEGAL FOUNDATION, Sacramento, California, for
Appellant. Nathan A. Gambill, OFFICE OF THE MICHIGAN ATTORNEY GENERAL,
Lansing, Michigan, for Appellee. **ON BRIEF:** Andrew R. Quinio, Donna G. Matias, PACIFIC
LEGAL FOUNDATION, Sacramento, California, for Appellant. Nathan A. Gambill, Echo
Aloe, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for
Appellee.

　　　The court delivered a PER CURIAM opinion. MATHIS, J. (pp. 19–25), delivered a
separate opinion concurring in the judgment.

—————————————

**OPINION**

—————————————

PER CURIAM.   Plaintiffs-Appellants Mike Yoder; Yoder's company, Drone Deer Recovery, LLC (DDR); and life-long hunter Jeremy Funke (collectively, Plaintiffs) appeal the district court's dismissal of their complaint challenging a Michigan law that bans the use of drones to hunt or collect downed game.  Because we find that Plaintiffs have standing but fail to state a claim on which relief can be granted, we AFFIRM.

## I.  Background

### A.  Factual Background

After a hunter shoots a game animal, such as a deer, the animal often runs away and dies in another location.  Tracking dogs and trail cameras are two ways of finding the animal.  DDR offers a third option—one that it says is less environmentally intrusive and more effective than dogs or trail cameras.  A hunter in an area where DDR does business can use DDR's website to connect with a nearby drone operator.  The drone operator then searches for the downed animal's heat signature using the drone's infrared camera and thermal imaging technology.  Upon finding a heat signature, the drone operator activates the drone's camera and search lights to identify the downed deer.

If the drone operator determines that the animal is dead or will die by the next morning, the operator creates a Global Positioning System (GPS) location pin for the animal's location and sends that information to the hunter.  The hunter can then find the downed animal using Google Maps or a similar application.

Plaintiffs allege that a Michigan law prohibiting the use of drones to hunt or take downed game (the Drone Statute) prevents DDR from doing business in Michigan.  *See* Mich. Comp. Laws § 324.40111c(2) (2015).  The Michigan State Legislature enacted the law to prevent the use of drones and unmanned submersibles—by either anti-hunting activists attempting to disrupt hunting or hunters seeking an unfair advantage—because such conduct "would violate fair-chase

principles and take away from the spirit and tradition of ethical hunting and fishing." R. 25-1, PID 123.

As relevant here, the Drone Statute proscribes "tak[ing] game or fish using an unmanned vehicle or unmanned device that uses aerodynamic forces to achieve flight." Mich. Comp. Laws § 324.40111c(2). The statute defines "take" as "to hunt with any weapon, dog, raptor, or other wild or domestic animal trained for that purpose; kill; chase; follow; harass; harm; pursue; shoot; rob; trap; capture; or collect animals, or to attempt to engage in such an activity." *Id.* § 324.40104(1). "Game" is any animal from an enumerated list of 39 wild animals. *Id.* § 324.40103(1). Violating the Drone Statute is a misdemeanor punishable by fine of $50–500 and/or up to ninety days' imprisonment. *Id.* § 324.40118.

The Michigan Department of Natural Resources (the MDNR) has regulatory authority over "managing animals" in Michigan, which includes determining "lawful methods of taking game." Mich. Comp. Laws § 324.40107(1). Accordingly, it is responsible for enforcing the Drone Statute. It has issued public guidance explaining that the Drone Statute prohibits individuals from using drones to locate or recover injured game, specifically stating that "[a]ttempting to locate and/or recover game, either dead or wounded, is an act which falls within the definition of 'take.'" Mich. Dep't of Nat. Res., *After the Harvest*, MICH. SMALL GAME HUNTING REGULS. SUMM. (2024), https://perma.cc/WN87-9FRY (the "Hunting Regulations Summary"). Plaintiffs also allege that the MDNR informed two persons who sent the MDNR inquiries about using drones to locate downed deer in Michigan that such drone use is illegal.

### B. Procedural History

Based on the facts described above, Plaintiffs sued the MDNR under 42 U.S.C. § 1983, alleging that the Drone Statute, as applied to them, violates their First Amendment right to create, disseminate, and receive location information for downed game. They sought both declaratory and injunctive relief, including a permanent injunction "restraining [the MDNR] . . . from enforcing [the Drone Statute] against Plaintiffs in a manner that prevents the creation, dissemination, and receipt of certain information." R. 23, PID 93.

The MDNR moved to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  It argued that the Drone Statute does not infringe on First Amendment-protected speech because the text of the statute prohibits only using a drone to locate a deer—something the MDNR argues is not speech—and does not prohibit telling another person a deer's location, which would be speech.  Accordingly, the MDNR contended that Plaintiffs had not shown a cognizable injury and, even if they had, they still lacked standing because the requested injunction would not allow DDR to operate in Michigan.  It also argued that the Eleventh Amendment precluded Plaintiffs' lawsuit.

The district court granted the MDNR's motion, holding that Plaintiffs both lacked standing and failed to state a claim on which relief could be granted.  It first "separated [Plaintiffs' conduct] into two elements:  flying a drone to track downed game (illegal and regulated) and relaying the location of the game to patron hunters (legal and unregulated)."  R. 28, PID 170.  It then determined that the Drone Statute does not prohibit Plaintiffs from sending or receiving location information, and that "[n]othing in the Drone Statute contemplates speech or its regulation."  *Id.*  The court also concluded that Plaintiffs' alleged injury was not redressable because the Drone Statute would still prohibit flying a drone to locate downed game even if the court granted Plaintiffs' requested injunction, which would "enjoin 'Defendant from enforcing Mich. Comp. Laws § 324.40111c against Plaintiffs in a manner that prevents the creation, dissemination, and receipt of certain information.'"  *Id.* (quoting R. 1, PID 9).

The district court determined that Plaintiffs had not stated a claim for similar reasons.  Because the court determined that using drones to track downed game and relaying location information to a hunter were separable, it examined only whether using a drone to search the wilderness for downed game constituted protected speech—a question it answered in the negative.  Accordingly, it granted the MDNR's motion to dismiss based on both Rule 12(b)(1) and Rule 12(b)(6).

This appeal followed.

## II.  Standard of Review

We review the district court's grant of a motion to dismiss for failure to state a claim de novo.  *Booth Fam. Tr. v. Jeffries*, 640 F.3d 134, 139 (6th Cir. 2011).  To survive a Rule 12(b)(6) motion to dismiss, a "complaint must present sufficient facts to 'state a claim to relief that is plausible on its face.'"  *Robbins v. New Cingular Wireless PCS, LLC*, 854 F.3d 315, 319 (6th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In determining whether a complaint meets that standard, we must "construe the complaint in the light most favorable to the plaintiff, draw all reasonable inferences in its favor, and accept all well-pleaded allegations in the complaint as true."  *Keene Grp., Inc. v. City of Cincinnati*, 998 F.3d 306, 310 (6th Cir. 2021).  But we may disregard "naked assertions devoid of further factual enhancement" and "formulaic recitation[s] of the elements of a cause of action."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up).

We also review de novo dismissals for lack of subject-matter jurisdiction, including dismissals for lack of standing.  *Phillips v. DeWine*, 841 F.3d 405, 413 (6th Cir. 2016).  A challenge to the court's subject-matter jurisdiction under Rule 12(b)(1) can be either facial or factual.  *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990).  Because the MDNR questions the sufficiency of the pleadings and does not dispute jurisdictional facts, it presents a facial attack on subject-matter jurisdiction.  *See Enriquez-Perdomo v. Newman*, 54 F.4th 855, 861 (6th Cir. 2022).  We therefore accept the well-pleaded factual allegations as true and construe the Complaint in Plaintiffs' favor.  *Id.*

## III.  Analysis

For the reasons discussed below, we find that Plaintiffs have standing.  We nonetheless affirm the district court's dismissal of their Complaint because Plaintiffs do not state a claim on which relief can be granted.

**A. Standing**

"Standing stems from the Constitution's mandate that federal courts may decide only 'Cases' or 'Controversies,'" *Vonderhaar v. Vill. of Evendale*, 906 F.3d 397, 400–01 (6th Cir. 2018) (citing U.S. Const. art. III, § 2, cl. 1), and is a prerequisite to federal jurisdiction, *Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 607 (6th Cir. 2007). "The irreducible constitutional minimum of standing contains three elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

First, Plaintiffs must have suffered an actual past injury, or will suffer imminent future injury, that is concrete and particularized. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016). "Particularized" means that "the injury must affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n. 1. "[A] 'generalized grievance,' no matter how sincere, is insufficient . . . ." *Hollingsworth v. Perry*, 570 U.S. 693, 706 (2013).

Second, Plaintiffs' injury must be "fairly traceable to" or causally connected to the challenged conduct, rather than "the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (cleaned up). Third, a favorable ruling on the requested relief must be likely to redress Plaintiffs' injury. *Id.* at 561.

**1. Injury**

In the pre-enforcement context, showing an imminent future injury requires plausibly alleging: (1) "an intention to engage in a course of conduct" that is (2) "arguably affected with a constitutional interest" but (3) is "proscribed by a statute," and (4) that there is "a credible threat of prosecution" under that statute. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). Plaintiffs have done so.

First, Plaintiffs have plausibly alleged an intention to bring DDR's business model to Michigan. In addition to alleging that DDR does business in other states, they allege that they receive "frequent requests for deer recovery services in Michigan," which they reject for "fear" that the MDNR will enforce the Drone Statute against them, but "are ready, willing, and able to operate in Michigan" absent a threat of enforcement. R. 23, PID 87. That is enough to plausibly

allege an intention to do business in Michigan. *See Kiser v. Reitz*, 765 F.3d 601, 608 (6th Cir. 2014) (finding that the plaintiff had plausibly alleged an intent to advertise his general surgery services where he "alleged that he has advertised . . . services in the past and that he intends to do so in the future").

Second, Plaintiffs' proposed course of conduct is arguably affected with a constitutional interest. "[T]he creation and dissemination of information are speech within the meaning of the First Amendment." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011). Accordingly, everything from prescriber information, *id.* at 570–71, to credit reports, *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 753, 759–61 (1985), and information on beer can labels, *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 481 (1995), may be speech for First Amendment purposes. And Plaintiffs' use of drones—a novel medium—does not necessarily put their creation of information beyond the bounds of First Amendment protections. *See, e.g., Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790 (2011) (extending First Amendment protections to video games); *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952) (extending First Amendment protections to movies); *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 783, 789–90 (5th Cir. 2024) (finding First Amendment interest in using a drone to take images while conducting aerial surveillance).

The MDNR makes three arguments to the contrary. It first argues that flying a drone is distinct from creating a location pin, and that the only allegedly protected activity is creating and sharing location pins, not operating a drone. But Plaintiffs specifically argue that the MDNR violated their First Amendment rights by preventing them from using drones to create and share location information, as opposed to flying drones for another purpose or creating location pins without using drones. Thus, for purposes of this specific as-applied challenge, we do not agree that flying drones is separable from creating and disseminating location information.

The MDNR also points out that the text of the Drone Statute itself prohibits conduct, not speech. Again, the case before us is an as-applied challenge. The question is whether the Drone Statute is unconstitutional as applied to Plaintiffs' intended conduct, not whether the Drone Statute is unconstitutional on its face. *Ross v. Duggan*, 402 F.3d 575, 582 n.3 (6th Cir. 2004). And, as discussed above, Plaintiffs have alleged that the MDNR's interpretation and proposed

enforcement of the Drone Statute burdens their First Amendment right to create and share information.

Finally, the MDNR points out that Plaintiffs can create location information for downed game without violating the Drone Statute because they need not use drones. But the availability of other ways of creating and sharing location information does not negate Plaintiffs' First Amendment interest in using drones to do so. *See Meyer v. Grant*, 486 U.S. 414, 424 (1988) ("That appellees remain free to employ other means to disseminate their ideas does not take their speech through [their preferred means] outside the bounds of First Amendment protection.").

The Drone Statute also proscribes Plaintiffs' intended conduct—the third *Susan B. Anthony List* element. 573 U.S. at 159. "[A]t the pre-enforcement stage, [Plaintiffs] need not prove conclusively that [their] intended course of conduct violates the [statute] but only that it is *arguably* proscribed by the statute." *Friends of George's Inc., v. Mulroy*, 108 F.4th 431, 437 (6th Cir. 2024). Plaintiffs make that showing here. Again, the Drone Statute prohibits "tak[ing] game or fish using an unmanned vehicle or unmanned device that uses aerodynamic forces to achieve flight." Mich. Comp. Laws § 324.40111c(2). The MDNR's own publicly issued guidance explains that using drones to locate dead or wounded game falls within the definition of "take." Hunting Reguls. Summ. ¶ 1. And Plaintiffs cannot use drones to create location information for downed game without using drones to locate the animal. *See Brown v. Kemp*, 86 F.4th 745, 763 (7th Cir. 2023) ("A statutory prohibition on a particular medium inevitably affects expression by restricting communication within and through the medium." (internal quotation marks and citation omitted)). The Drone Statute thus effectively prohibits Plaintiffs from creating location information using drones, even though the statutory text itself does not expressly prohibit creating location information. *Cf. W. Watersheds Project v. Michael*, 869 F.3d 1189, 1195, 1197 (10th Cir. 2017) (holding that statutes that prohibited crossing private property to collect "resource data" such as photographs, notes, and audio recordings if the individual also recorded the geographic coordinates where the data was gathered implicated First Amendment interests).

With respect to the final *Susan B. Anthony List* element, Plaintiffs have shown a credible threat of prosecution. 573 U.S. at 159. We have previously found that plaintiffs show a credible threat of enforcement where they allege "a subjective chill *and* point to some combination" of the following four factors: (1) "a history of past enforcement"; (2) receipt of "enforcement warning letters . . . regarding their specific conduct"; (3) "an attribute of the challenged statute that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action"; and (4) whether the defendant has "disavow[ed] enforcement of the challenged statute against a particular plaintiff." *McKay v. Federspiel*, 823 F.3d 862, 869 (6th Cir. 2016). A plaintiff need not satisfy all the *McKay* factors to establish a credible threat. *Christian Healthcare Ctrs., Inc. v. Nessel*, 117 F.4th 826, 848 (6th Cir. 2024).

Taken together, the *McKay* factors cut in Plaintiffs' favor. First, Plaintiffs allege that they have neither operated in Michigan (Yoder and DDR) nor requested drone recovery services in Michigan (Funke) due to "fear that if they [do so] within the state, they will be subject to enforcement action and its consequences." R. 23, PID 91. We have previously found credible fear where a plaintiff had to "censor himself to avoid violating" the statutes at issue. *See Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Sup. Ct.*, 769 F.3d 447, 452 (6th Cir. 2014) (cleaned up).

Second, Plaintiffs allege that the MDNR "actively enforces" the Drone Statute, R. 23, PID 89, and the MDNR asserts in its briefing that it can issue citations for violating the Drone Statute.

Third, although Plaintiffs did not receive warning letters addressed to them individually, Defendants have publicly issued guidance that "addresses the central issue of" Plaintiffs' intended conduct. *See Boone Cnty. Republican Party Exec. Comm. v. Wallace*, 132 F.4th 406, 417 (6th Cir. 2025) (finding that the "argument [that an advisory opinion directly addressing the plaintiffs' conduct was not a warning letter for purposes of the *McKay* factors] elevates form over substance").

Fourth, the Drone Statute contains no potential for exemptions that make the threat of enforcement remote. *See McKay*, 823 F.3d at 869–70.

Finally, MDNR officials have not disavowed enforcement. True, the MDNR says it has no plans "to prosecute Plaintiffs or anyone else for creating or disseminating location pins." Appellee's Br. at 23. But again, Plaintiffs specifically want to use drones to create location information—conduct for which the MDNR has not clearly disavowed enforcement. By contrast, MDNR has specifically advised the public that "the use of drones to pursue wildlife in any manner . . . is illegal." Hunting Reguls. Summ. Moreover, the MDNR has not represented that it disavowed enforcement in a non-litigation context, and "the government's disavowal must be more than a mere litigation position." *Lopez v. Candaele*, 630 F.3d 775, 788 (9th Cir. 2010).

Accordingly, Plaintiffs have shown a credible threat of enforcement sufficient to meet their burden for demonstrating a pre-enforcement injury. *See Kareem v. Cuyahoga Cnty. Bd. of Elections*, 95 F.4th 1019, 1027 (6th Cir. 2024) (finding a credible threat of enforcement where the plaintiff faced imprisonment for violating the statute at issue, the defendant stated that the plaintiff's intended conduct was illegal and did not disavow enforcement, and the defendant had previously told an individual to not engage in the same conduct the plaintiff intended). Although Plaintiffs have not shown that the MDNR has previously enforced the Drone Statute, "past enforcement is not necessary to establish a credible threat of enforcement." *Id.* at 1025.

In short, Plaintiffs have shown that they intend to engage in conduct that is at least "arguably affected with a constitutional interest," that their intended conduct is "proscribed by a statute," and that they face "a credible threat of prosecution" if DDR begins doing business in Michigan. *Susan B. Anthony List*, 573 U.S. at 159. Although this is a close question, "First Amendment standards . . . must give the benefit of any doubt to protecting rather than stifling speech." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 327 (2010) (quotation marks and citation omitted)). We thus find that Plaintiffs have plausibly alleged an injury-in-fact.

## 2. Traceability

Causation—the second prong—requires that the injury be "fairly . . . trace[able] to the challenged action of the defendant." *Lujan*, 504 U.S. at 560 (quotation omitted). Here, Plaintiffs have alleged that the MDNR enforces the Drone Statute, and that it has statutory authority to do so. Further, MDNR conservation officers can patrol to enforce laws and regulations,

Mich. Dep't of Nat. Res., *Conservation officers*, https://perma.cc/LXN3-LRRY,**1** and the MDNR acknowledges on appeal that it can issue citations for violating the Drone Statute.**2**

Because the MDNR "play[s] a direct role in enforcing" the Drone Statute, *Somberg v. McDonald*, 117 F.4th 375, 381 (6th Cir. 2024) (explaining that plaintiffs must sue the state actor "with power to inflict the penalty" to show causation in a pre-enforcement action); *Kareem*, 95 F.4th at 1027, the alleged violation of Plaintiffs' First Amendment rights can be fairly traced to the MDNR.

### 3. Redressability

Redressability means that it is "likely," not "speculative," that a favorable decision will redress the plaintiff's injury. *Lujan*, 504 U.S. at 561 (quotation omitted). Again, Plaintiffs allege that the MDNR's threatened actions chill their ability to create, disseminate, and receive information about downed game using drones. And they seek "[a] declaration that the [MDNR's] interpretation of [the Drone Statute], as applied to Plaintiffs, violates" their constitutional rights, along with a permanent injunction preventing the MDNR and its officers and agents from enforcing the Drone Statute "against Plaintiffs in a manner that prevents the creation, dissemination, and receipt of certain information." R. 23, PID 93. That injunctive relief would allow Plaintiffs to provide and receive drone-based game-recovery services—thus removing the impediment to the exercise of their asserted First Amendment rights. *See Kareem*, 95 F.4th at 1027 (finding redressability met when the plaintiff's requested relief was "substantially likely to remedy her alleged injury").

---

**1**Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); *Demis v. Sniezek*, 558 F.3d 508, 513 n. 2 (6th Cir. 2009) (taking notice of government website); *United States v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017) ("Under Federal Rule of Evidence 201(b) . . . [t]his court and numerous others routinely take judicial notice of information contained on state and federal government websites." (collecting cases)).

**2**The MDNR's website also suggests that conservation officers issue citations for violations of Michigan's natural resources laws. *See, e.g.*, Mich. Dep't of Nat. Res., *CO Biweekly Reports* (12/12/2023–1/6/2024) (Jan. 6, 2025), https://perma.cc/U3CP-3JRA(describing multiple incidents where conservation officers issued citations).

The MDNR argues that Plaintiffs' requested injunction would not redress their injury because MDNR "officials could still issue a citation to Plaintiffs if they use a drone to chase, follow, or pursue a deer that had been shot." Appellee's Br. at 25. But this argument is unpersuasive unless we agree that Plaintiffs' intended conduct can be separated into two distinct elements: flying drones and creating location information. As discussed above, in this as-applied challenge, we do not. Accordingly, Plaintiffs have shown redressability.

## B. Merits[3]

Turning to the merits of Plaintiffs' First Amendment claims, we conclude that intermediate scrutiny applies. And because Plaintiffs have not shown that the Drone Statute fails intermediate scrutiny, their challenge must fail.

### 1. Level of Scrutiny

Plaintiffs offer three arguments in favor of applying strict scrutiny—that the Drone Statute is content-based, that the statute involves "speech inputs," and that their intended conduct is inherently expressive conduct. None persuades.

#### a. The Drone Statute is not content-based.

Content-based laws "target speech based on its communicative content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). The First Amendment prohibits the government from "restrict[ing] expression"—including conduct—"because of its message, its ideas, its subject matter, or its content." *Id.* (quotation omitted). Content-based restrictions on expression must therefore satisfy strict scrutiny. *Id.* at 163–64. The distinction between content-based and content-neutral restrictions is "whether the law is justified without reference to the content of the regulated speech." *McCullen v. Coakley*, 573 U.S. 464, 480 (2014) (internal quotation marks omitted).

---

[3]The MDNR argued below, and continues to argue on appeal, that the Eleventh Amendment bars Plaintiffs' suit. The district court did not address the MDNR's sovereign immunity arguments because other issues were dispositive. Because the same is true on appeal, we also do not reach the sovereign immunity issue.

The Drone Statute is content-neutral.  The statute makes it a crime to "take" game—a term defined to include "hunt[ing]," "chas[ing]," "follow[ing]," "pursu[ing]," and "trap[ping]" or "captur[ing]" animals—using drones.  Mich. Comp. Laws § 324.40104(1).  On its face, that prohibition applies equally to hunters who want to recover downed game, anti-hunting activists who want to find injured animals to nurse them back to health, and anyone else who wants to use a drone to "follow" an animal.  The legislative history of the Drone Statute confirms that legislators enacted the law specifically to prevent drone use by both hunters and persons wishing to disrupt hunting.[4]  And the MDNR need not examine the contents of transmissions to determine whether a pilot is violating the Drone Statute because using a drone to locate an injured animal violates the Drone Statute even if the pilot never shares a location pin with anyone else.  Plaintiffs' contention that the statute is a content-based restriction because it singles out location information of downed game, and because the MDNR must look at the contents of drones' transmissions to determine whether drone users are violating the Drone Statute, is therefore unpersuasive.

Plaintiffs' argument that the Drone Statute is content-based because the MDNR allows drone use for other purposes—like assessing forest health—fares no better.  Again, the relevant inquiry is "whether the law is justified without reference to the content of the regulated speech." *McCullen*, 573 U.S. at 480 (internal quotation marks omitted).  As discussed above, the Drone Statute does not ban the use of drones for taking game based on the message conveyed or the information created.  *See Nat'l Press Photographers Ass'n*, 90 F.4th at 790 (finding that a statute prohibiting the use of drones to surveil others did "not directly or even primarily regulate speech and expression—nor [did it] target any particular message, idea, or subject matter").  The statute therefore does not regulate drone use based on the information the drone might create in the process, but because "of the action it entails"—pursuing injured animals.  *R.A.V. v. City of St. Paul*, 505 U.S. 377, 385 (1992).

---

[4]Lawmakers' stated rationale for enacting the Drone Statute was two-fold.  They were concerned that persons opposed to hunting, such as those affiliated with People for the Ethical Treatment of Animals (PETA), might use drones to "disrupt" or "interfere with lawful hunting or fishing."  R. 25-1, PID 123.  They were also concerned that hunters and fishermen could use drones "to aid in taking game or fish," thus "violat[ing] fair-chase principles and tak[ing] away from the spirit and tradition of ethical hunting and fishing."  *Id.*

In short, the Drone Statute incidentally burdens Plaintiffs' ability to create location information, rather than targeting expression. The law is thus content-neutral. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *see also Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 645 (1994) (finding regulations content-neutral because they "distinguish between speakers in the television programming market" but do so "based only upon the manner in which speakers transmit their messages to viewers, and not upon the messages they carry").

### b. Drones are not speech inputs.

Plaintiffs next argue that, because drones have recording and information-creation capabilities, drones create speech and are inputs entitled to heightened protections. In support of this argument, they point to *Lichtenstein v. Hargett*, 83 F.4th 575, 584 (6th Cir. 2023). In *Lichtenstein*, we examined several Supreme Court cases—*Sorrell*, 564 U.S. at 571 (explaining that a regulation prohibiting trade magazines from purchasing ink would be a speaker- and content-based restriction); *Buckley v. Valeo*, 424 U.S. 1, 44–45 (1976) (per curiam) (applying heightened scrutiny to a statute limiting the amount of money individuals could contribute to political candidates because it limited "core First Amendment . . . rights"); *Meyer*, 486 U.S. at 421–22, 25 (applying heightened scrutiny to a statute that prohibited paying circulators to gather signatures to place an amendment on a state ballot); and *Buckley v. American Constitutional Law Foundation, Inc*, 525 U.S. 182, 188, 195 (1999) (applying heightened scrutiny to a regulation that allowed only registered votes to act as petition circulators). 83 F.4th at 585–86. Relying on these cases, we suggested that regulations of certain "inputs" that create speech, such as money or ink, must survive strict scrutiny. *Id.* at 586.

*Lichtenstein* is not as broad as Plaintiffs suggest. Rather, *Lichtenstein's* discussion of "speech inputs" refers to "inputs" that create traditional "political speech." *Id.* at 586–87. Three of the four cases *Lichtenstein* cites for the "speech inputs" proposition involved restrictions on "core" political speech—something no party contends applies here. *Buckley*, 424 U.S. at 44–45; *Meyer*, 486 U.S. at 420; *Am. Const. L. Found.*, 525 U.S. at 204, 210. And *Sorell*—the fourth case *Lichtenstein* cites—is inapposite because the restriction at issue in that case was a content-based restriction. 564 U.S. at 571. We therefore find that Plaintiffs have not shown that drones used to create location information for downed game are "speech inputs" meriting strict scrutiny.

*c. Flying a drone is not inherently expressive conduct.*

That leaves Plaintiffs' third and final argument in favor of strict scrutiny: that drone use is inherently expressive conduct. Conduct that is "sufficiently imbued with elements of communication" implicates the First Amendment. *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (quoting *Spence v. Washington*, 418 U.S. 405, 409 (1974)). To be "inherently expressive" conduct, *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 66 (2006), the conduct must "convey a particularized message" that someone viewing the conduct would most likely understand, *Johnson*, 491 U.S. at 404 (quotation omitted). Examples of inherently expressive conduct include wearing armbands to protest a war or displaying a flag in support of a political party. *See Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 388–89 (6th Cir. 2005).

We agree with the Fifth Circuit that "the operation of a drone is not inherently expressive." *Nat'l Press Photographers Ass'n*, 90 F.4th at 787. Operating a drone sends no "particularized message," *Johnson*, 491 U.S. at 404 (quotation omitted), and certainly not one that a viewer could understand "from the conduct *alone* without any accompanying speech explaining the reasons behind it," *Lichtenstein*, 83 F.4th at 594. And because flying a drone itself does not send any kind of message, Plaintiffs cannot convert drone use into expressive conduct "simply by talking about it." *Rumsfeld*, 547 U.S. at 66.

Plaintiffs resist this conclusion by pointing to several out-of-circuit cases finding that making an audio or video recording is expressive activity: *Animal Legal Defense Fund v. Wasden*, 878 F.3d 1184, 1204 (9th Cir. 2018); *Kemp*, 86 F.4th at 779; and *360 Virtual Drone Services LLC v. Ritter*, No. 5:21-CV-137, 2023 WL 2759032, at *9 (E.D.N.C. Mar. 31, 2023). But none of those cases are on point because Plaintiffs allege that they capture only location information, not audio or video recordings. *See FCC v. Pacifica Found.*, 438 U.S. 726, 748 (1978) ("We have long recognized that each medium of expression presents special First Amendment problems."). Additionally, the Ninth Circuit has since clarified that *Wasden* does not stand for the proposition that all recording is expressive activity. *Project Veritas v. Schmidt*, 125 F.4th 929, 946 (9th Cir. 2025) (en banc) ("*Wasden* reasoned that it defied common sense to disaggregate the creation of the video, which may involve expressive decisions, from the video or audio recording itself . . . . *Wasden* did not conclude that every act of recording requires

expressive decisions, nor that every act of recording implicates the First Amendment." (cleaned up)). Accordingly, we decline to treat the proposed drone operation in this case as expressive conduct requiring the application of strict scrutiny.

## 2. Application of Intermediate Scrutiny

Intermediate scrutiny applies to regulations that are content-neutral and do not rise to a level requiring strict scrutiny. *Turner Broad. Sys., Inc.*, 512 U.S. at 662; *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 567 (1991) (intermediate scrutiny applies when "speech and nonspeech elements are combined in the same course of conduct" (internal quotation marks and citation omitted)); *Johnson*, 491 U.S. at 407 (1989) (intermediate scrutiny applies to regulations of conduct "unrelated to the suppression of free expression" (quotation omitted)). We therefore apply it here. *Accord Nat'l Press Photographers Ass'n*, 90 F.4th at 788 (applying intermediate scrutiny to a facial challenge to a prohibition on capturing images using a drone while conducting surveillance).

Under intermediate scrutiny, a statute is constitutional "if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *United States v. O'Brien*, 391 U.S. 367, 377 (1968). "[H]ighly general interests that are obviously important" can satisfy the governmental interest prong. *Lichtenstein,* 83 F.4th at 596–97.

Michigan has constitutional and statutory authority to enact the Drone Statute, which conserves and preserves its natural resources. Michigan's constitution empowers the Michigan legislature to "provide for the protection of . . . natural resources of the state." Mich. Const. art. IV, § 52. That includes regulating the taking of game. *People v. Zimberg*, 33 N.W.2d 104, 106–07 (Mich. 1948). Moreover, the Michigan Legislature has previously determined that "hunting, fishing, and the taking of game are "a valued part of the cultural heritage of [Michigan] [that] should be forever preserved." Mich. Comp. Laws § 324.40113a(3).

The Drone Statute furthers those important conservation and preservation interests. Again, the legislative history of the Drone Statute demonstrates that the Michigan Legislature passed the Drone Statute to preserve fair-chase principles and prevent anti-hunting activists from disrupting hunting. And managing how hunters can hunt Michigan's wild animals is an important state interest. *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 299 (1984) (observing that conserving park property is a substantial interest under *O'Brien*).

As explained above, the Drone Statute incidentally burdens expression, rather than targeting it. It is thus "unrelated to the suppression of free expression." *O'Brien*, 391 U.S. at 377.

Finally, the Drone Statute restricts First Amendment expression no more than necessary. A statute is sufficiently narrowly tailored to survive intermediate scrutiny when "an adequate relationship exists between the means (the conduct ban) and the ends (the government interest) as long as the interest 'would be achieved less effectively' without the ban." *Lichtenstein*, 83 F.4th at 598 (quoting *Rumsfeld*, 547 U.S. at 67). In other words, the statute "need only 'further' the [government's] interest." *Id.* (quoting *City of Erie v. Pap's A.M.*, 529 U.S. 277, 301 (2000) (plurality opinion)); *see also Clark*, 468 U.S. at 297 ("[I]f the parks would be more exposed to harm without the sleeping prohibition than with it, the ban is safe from invalidation under the First Amendment . . . .").

The Drone Statute is narrowly tailored because it would be harder for Michigan to achieve its stated interests—protecting its natural resources and preserving fair-chase principles in hunting—without banning the use of drones to take game. Making an exception for using drones to create location information for downed game might not necessarily threaten those interests. But "[t]he First Amendment does not bar application of a neutral regulation that incidentally burdens speech merely because a party contends that allowing an exception in the particular case will not threaten important government interests." *United States v. Albertini*, 472 U.S. 675, 688 (1985); *see also FTC v. Superior Ct. Trial L. Ass'n*, 493 U.S. 411, 430 (1990). Accordingly, it is enough for the MDNR to show that prohibiting the use of drones to take game furthers Michigan's stated, important interests. Plaintiffs therefore have failed to state a claim on which relief can be granted.

\*     \*     \*

For the reasons set out above, we AFFIRM.

—————————————

**CONCURRENCE**

—————————————

MATHIS, Circuit Judge, concurring in the judgment. Michigan law bars the use of drones to hunt or collect game animals. This creates a problem for Mike Yoder and his company, Drone Deer Recovery LLC. As the name of the company suggests, Drone Deer Recovery uses drones to help hunters locate and recover downed deer. Drone Deer Recovery operates in several states and it now seeks to expand to Michigan, as its potential customer, Jeremy Funke, lives and hunts there.

Yoder, Drone Deer Recovery, and Funke sued the director of the Michigan Department of Natural Resources. They argue that the prohibition on using drones to hunt or collect downed deer violates their free-speech rights because it prevents Drone Deer Recovery from using a drone to communicate location information about a downed deer to a hunter such as Funke. The district court dismissed their complaint for lack of subject-matter jurisdiction and for failure to state a claim. I would affirm the district court's decision because Plaintiffs have not established Article III standing.

**I.**

**A.**

The Michigan Constitution declares that "[t]he conservation and development of the natural resources of the state are . . . of paramount public concern." Mich. Const. art. IV, § 52. It authorizes the Michigan legislature to "provide for the protection of the . . . natural resources of the state." *Id.* Under this authority, the Michigan legislature has acted to regulate the hunting of game. The Michigan legislature has determined that hunting, fishing, and the taking of game are: (1) "a valued part of the cultural heritage of [Michigan] [that] should be forever preserved"; (2) important to the state's economy; and (3) vital to the conservation and preservation of its natural resources. Mich. Comp. Laws § 324.40113a(3).

One such regulation is at issue. In 2015, the Michigan legislature passed the Drone Statute, which provides, in pertinent part: "An individual shall not take game or fish using an unmanned vehicle or unmanned device that uses aerodynamic forces to achieve flight[.]" *Id.* § 324.40111c(2). "'Take' means to hunt with any weapon, dog, raptor, or other wild or domestic animal trained for that purpose; kill; chase; follow; harass; harm; pursue; shoot; rob; trap; capture; or collect animals, or to attempt to engage in such an activity." *Id.* § 324.40104(1). And "game" includes 39 wild animals, including deer. *Id.* § 324.40103(1). A violation of the Drone Statute is a misdemeanor punishable by a fine or imprisonment. *Id.* § 324.40118(1).

The Michigan legislature created the Michigan Department of Natural Resources to "protect and conserve" Michigan's "natural resources." *Id.* §§ 324.501(1); 324.503(1). MDNR has regulatory authority over "manag[ing] animals" in Michigan, which includes determining "lawful methods of taking game." *Id.* § 324.40107(1)(e). It requires anyone who kills or wounds a game animal to make a reasonable attempt to retrieve the animal. Mich. Dep't of Nat. Res., Wildlife Conservation Ord., ch. IV, § 4.1(2). MDNR has explained that the Drone Statute prohibits individuals from using drones to locate or recover injured game:

> The use of drones to pursue wildlife in any manner, either during legal hunting hours or after, is illegal. You may not take game or fish using an unmanned vehicle or unmanned device that uses aerodynamic forces to achieve flight or using an unmanned vehicle or unmanned device that operates on the surface of water or underwater. . . . Attempting to locate and/or recover game, either dead or wounded, is an act which falls within the definition of "take."

*See* Mich. Dep't of Nat. Res., 2023 Mich. Hunting Reguls. Summary, 25.[1]

**B.**

Plaintiffs seek to challenge the constitutionality of the Drone Statute. Jeremy Funke hunts deer and other game on private and public land in Michigan. After a hunter (like Funke) shoots an animal, it often runs away and dies in a distant location, making it difficult for the hunter to locate and retrieve it. This is where Mike Yoder and Drone Deer Recovery come in.

---

[1]https://cms2.revize.com/revize/washingtonmi/2023%20Michigan%20Hunting%20Regulations%20Summary.pdf.

Yoder, who is also a hunter, developed Drone Deer Recovery to use drones to locate downed deer.

Drone Deer Recovery's service is straightforward.  Using its website, a hunter can find a drone operator (like Yoder) in the area to locate a lost deer.  The operator will dispatch a drone to the area.  The drone then uses an infrared camera and thermal imaging to search for the downed animal's heat signature.  Once the drone finds a heat signature, the operator activates the camera and searchlights to identify the animal.  If the operator confirms it is dead or dying, he uses the drone to create a location pin with the animal's coordinates.  The operator then sends the location information to the hunter, who can then retrieve the animal.

Yoder and Drone Deer Recovery allege that the Drone Statute prevents them from operating in Michigan.  "DNR officials have advised Drone Deer Recovery that it is unlawful under state law to use drones in any manner related to hunting."  R. 23, PageID 89.  So Yoder and Drone Deer Recovery do not operate in Michigan (and Funke does not use their services) for fear of violating Michigan law.

## II.

Federal courts have subject-matter jurisdiction over "Cases" and "Controversies."  U.S. Const. art. III, § 2, cl. 1.  So before considering a claim's merits, a plaintiff must establish that it has standing to sue.  *Kitchen v. Whitmer*, 106 F.4th 525, 533 (6th Cir. 2024).

Standing requires the plaintiff to "have a personal stake in the case."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citation modified).  "The doctrine of standing gives meaning" to Article III "by identifying those disputes which are appropriately resolved through the judicial process."  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014) (citation modified).  "[A] citizen does not have standing to challenge a government regulation simply because the plaintiff believes that the government is acting illegally."  *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024).  To establish standing, a plaintiff must show that: (1) he "has suffered or likely will suffer an injury in fact," (2) "the injury likely was caused or will be caused by the defendant," and (3) "the injury likely would be redressed by the requested judicial relief."  *Id.* at 380.

Plaintiffs bear the burden of proving standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). They must establish standing "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Because the district court dismissed this case at the pleading stage, Plaintiffs needed to "clearly allege facts demonstrating" standing. *Spokeo*, 578 U.S. at 338 (citation modified).

Typically, "a statute must be enforced against the plaintiff before he may challenge its constitutionality." *Phillips v. DeWine*, 841 F.3d 405, 415 (6th Cir. 2016). That said, a plaintiff can bring a pre-enforcement challenge "under circumstances that render the threatened enforcement sufficiently imminent." *Susan B. Anthony List*, 573 U.S. at 159. Indeed, "where threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007).

Plaintiffs bring a pre-enforcement challenge against MDNR. "In a pre-enforcement challenge, whether the plaintiff has standing to sue often turns upon whether he can demonstrate an 'injury in fact' before the state has actually commenced an enforcement proceeding against him." *Kiser v. Reitz*, 765 F.3d 601, 607 (6th Cir. 2014). Plaintiffs cannot show that they will likely suffer an injury in fact.

An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (citation modified). A plaintiff establishes an injury in fact in a pre-enforcement action if "he alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List*, 573 U.S. at 159 (citation modified). I assume that Plaintiffs have alleged their intent to engage in constitutionally protected conduct proscribed by the Drone Statute.

Still, Plaintiffs needed to show a credible threat of enforcement of the Drone Statute against them by MDNR. To that end, Plaintiffs must have "an actual and well-founded fear that the law will be enforced against them." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393

(1988).  But "mere allegations of a subjective chill on protected speech are insufficient." *McKay v. Federspiel*, 823 F.3d 862, 868 (6th Cir. 2016) (citation modified).  Instead, the plaintiff must show subjective chill and a combination of the factors below (the *McKay* factors):

> (1) a history of past enforcement against the plaintiffs or others; (2) enforcement warning letters sent to the plaintiffs regarding their specific conduct; (3) an attribute of the challenged statute that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action; and (4) the defendant's refusal to disavow enforcement of the challenged statute against a particular plaintiff.

*Christian Healthcare Ctrs., Inc. v. Nessel*, 117 F.4th 826, 848 (6th Cir. 2024) (citation modified).  The "*McKay* factors are not exhaustive," and a plaintiff need not satisfy all the factors to establish a credible threat.  *Online Merchs. Guild v. Cameron*, 995 F.3d 540, 550 (6th Cir. 2021).

Plaintiffs allege subjective chill here.  They do not operate in Michigan because they "fear enforcement action and its consequences."  R. 23, PageID 91 (citation modified).  So I turn to whether Plaintiffs have pleaded sufficiently a combination of the *McKay* factors.

*Past Enforcement*.  Plaintiffs have not established a history of past enforcement of the Drone Statute by MDNR.  The Supreme Court has explained "that past enforcement against the same conduct is good evidence that the threat of enforcement is not chimerical." *Susan B. Anthony List*, 573 U.S. at 164 (citation modified).  "A threat of enforcement is most credible when the *same conduct* has drawn enforcement actions or threats of enforcement in the past." *Christian Healthcare Ctrs.*, 117 F.4th at 848 (citation modified).

Plaintiffs say that MDNR "actively enforces the ban on drones" under the Drone Statute. R. 23, PageID 89.  In support, they point to emails MDNR enforcement officials sent to Mike Cassells and Daniel Schultz, two individuals "interested in using drone location." *Id.*  Plaintiffs allege that the emails stated that "using drones to locate downed deer in Michigan is illegal," and that "the use of drones related to locating wildlife in any manner is illegal." *Id.*  But general statements that MDNR "actively enforces the ban on drones" or that an action is illegal are not enforcement actions or threats. *See Boone Cnty. Republican Party Exec. Comm. v. Wallace*, 132 F.4th 406, 416 (6th Cir. 2025) ("generalized contention" that the defendant "actively enforces" a statute "offers little support for the argument that the [defendant] will enforce here").

Indeed, Plaintiffs never alleged that MDNR enforced the Drone Statute against them or any other drone operators. *See Fischer v. Thomas*, 52 F.4th 303, 308 (6th Cir. 2022) (per curiam) ("[W]e allow [plaintiffs] to meet this factor by pointing to past enforcement against others."). True enough, "a plaintiff need not always show that the statute has been enforced previously against the precise conduct it wishes to undertake." *Christian Healthcare Ctrs.*, 117 F.4th at 849. But Plaintiffs fail to allege *any* instances of enforcement since the legislature enacted the Drone Statute in 2015.

*Warning Letter*. Plaintiffs have not alleged that MDNR sent them a warning letter. They do allege, however, that MDNR's "agents or employees have recently explicitly articulated the DNR's position on the legality of [Drone Deer Recovery]'s business," presumably through the emails to Cassells and Schultz. R. 23, PageID 91. Plaintiffs also noted in their briefing that MDNR issued guidance stating that "[t]he use of drones to pursue wildlife in any manner, either during legal hunting hours or after, is illegal," and that "[a]ttempting to locate and/or recover game, either dead or wounded, is an act which falls within the definition of 'take.'" *See* Mich. Dep't of Nat. Res., 2023 Mich. Hunting Reguls. Summary, 25. But neither the emails nor the guidance is an "enforcement warning letter[] *sent to the plaintiffs* regarding their specific conduct." *McKay*, 823 F.3d at 869 (emphasis added).

To begin, neither was directed at Plaintiffs. *See id.* The guidance addresses the public at large. And MDNR emailed Cassells and Schultz, not Plaintiffs. The complaint also fails to allege that MDNR's emails addressed Plaintiffs specifically. *See id.* (signs threatening enforcement did not show credible threat of enforcement in part because they "address the general public, not [the plaintiff] specifically or any of his past conduct").

Consider the warning letters in *Fischer*. There, this court found a credible enforcement threat when the letters "warned that [the defendant] had launched a preliminary investigation into [the plaintiffs'] conduct." 52 F.4th at 308; *see also Winter v. Wolnitzek*, 834 F.3d 681, 687 (6th Cir. 2016) (finding credible threat of enforcement when letter stated that the defendant had "probable cause for action" against the plaintiff for her conduct (quotation omitted)). Plaintiffs make no similar allegations here. As a result, this factor weighs against them.

*Ease of Enforcement*.  Plaintiffs point to nothing about the Drone Statute "that makes enforcement easier or more likely." *See McKay*, 823 F.3d at 869.  The credibility of a threat of enforcement increases when the statute allows "any member of the public to initiate an enforcement action," *id.*, rather than when it is "limited to a prosecutor or an agency," *Susan B. Anthony List*, 573 U.S. at 164.  A violation of the Drone Statute can lead to criminal penalties, Mich. Comp. Laws § 324.40118(1), which means a prosecutor can enforce the statute.  *See Friends of George's, Inc. v. Mulroy*, 108 F.4th 431, 440 (6th Cir. 2024) (concluding criminal statute was "a standard criminal law with no attributes making enforcement easier or more likely").  And MDNR has conceded that it can issue a citation for a violation of the statute.  But Plaintiffs do not allege that members of the public can file complaints or initiate enforcement. *See, e.g.*, *Wallace*, 132 F.4th at 417; *Fischer*, 52 F.4th at 308–09.  So this factor weighs against Plaintiffs too.

*Disavowal*.  MDNR asserts in its brief that it has no "plan to prosecute Plaintiffs or anyone else for creating or disseminating location[] pins."  D. 21 at p.30.  This purported disavowal falls flat.  Plaintiffs intend to create location information *using a drone*.  And MDNR has not disavowed prosecuting them for such conduct.  So this factor weighs in Plaintiffs' favor.

*       *       *

Plaintiffs have established only one of the *McKay* factors—refusal to disavow enforcement.  Yet disavowal "is just one data point among many on the question [of] whether a credible threat of enforcement exists." *Davis v. Colerain Township*, 51 F.4th 164, 174 (6th Cir. 2022).  The other *McKay* factors confirm that Plaintiffs have alleged no "circumstances that render . . . threatened enforcement sufficiently imminent." *Susan B. Anthony List*, 573 U.S. at 159.  They fail to identify a history of enforcement of the Drone Statute, that they received a warning letter, or that an attribute of the Drone Statute makes enforcement easier.

With no credible threat of enforcement, Plaintiffs cannot show an injury in fact. Plaintiffs therefore lack standing.